In the Matter of the Involuntary Termination of Parent–Child Relationship of C.T., a Minor Child and his Father, D.B., and his Mother, K.T., Appellants,

v.

MARION COUNTY DEPARTMENT OF CHILD SERVICES,
Appellee,

and

Child Advocates, Inc., Co–Appellee, Guardian ad Litem.

No. 49A02–0803–JV–231.

Court of Appeals of Indiana.

Nov. 18, 2008.

Transfer Denied Feb. 5, 2009.

Patricia Caress McMath, Indianapolis, IN, Attorney for Appellant, D.B.

Anna E. Onaitis, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant, K.T.

Barry A. Chambers, Department of Child Services, Indianapolis, IN, Christy L. Lay, Department of Child Services, Jeffersonville, IN, Attorneys for Appellee and Co-Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Kristie Thompson and Dennis Brown appeal the involuntary termination of their respective parental rights to their son, C.T. We affirm.

### Issues

The parents raise separate issues on appeal, which we consolidate and restate as:

I. whether the juvenile court's judgment terminating Thompson's and Brown's parental rights is supported by clear and convincing evidence; and

II. whether Brown was denied due process of law when the juvenile court denied his motion to continue.

### Facts

Thompson and Brown are the biological parents of C.T., born on December 2, 2006.

The facts most favorable to the juvenile court's judgment reveal that on December 5, 2006, the Marion County Department of Child Services ("MCDCS") filed a petition alleging C.T., who had been removed from Thompson and placed in foster care, was a child in need of services ("CHINS") because he tested positive for cocaine at birth. The CHINS petition also indicated that Thompson had an "extensive history with MCDCS, including an open CHINS case involving her older children for which she has failed to complete rehabilitative services." Ex. p. 2. A detention hearing was held the same day, and the juvenile court found there was probable cause to believe C.T. was a CHINS. Brown was incarcerated at the time of C.T.'s birth.

This was neither Thompson's nor Brown's first contact with MCDCS. In 2003, MCDCS filed a petition alleging the couple's two children, Ty.T. and C.T.B., as well as Thompson's additional child, T.T., were CHINS.[1] Prior to filing the CHINS petition in this case, Thompson had been offered an informal adjustment because T.T. tested positive for cocaine at birth. The agreement later failed when C.T.B. was born and tested positive for marijuana. All three children were removed from Thompson's and Brown's care. Reunification services were offered to both parents but were never completed. Additionally, at some point during the CHINS proceedings, Brown was incarcerated. Both Thompson's and Brown's parental rights to T.T., C.T.B., and Ty.T. were involuntarily terminated on November 4, 2005, and all three children were subsequently adopted.

Meanwhile, on or around December 29, 2004, MCDCS opened another case involving Thompson and Brown because Thomp-

---

1. Brown is the alleged biological father of Ty.T. and C.T.B., but the record is unclear as to whether paternity was ever legally established for these children. Brown is not alleged to be the biological father of T.T.

son had given birth to a fourth child, K.T., who also tested positive for cocaine.[2] K.T. was removed from Thompson's care and determined to be a CHINS pursuant to an agreed entry wherein Thompson admitted to the allegations of the CHINS petition. At the time of the fact-finding hearing on the CHINS petition as to K.T., Brown was again incarcerated. Neither Thompson nor Brown completed reunification services and separate petitions for the involuntary termination of their respective parental rights to K.T. were eventually filed. Following a full-day evidentiary hearing on the involuntary termination petition, Thompson signed a consent form for the voluntary relinquishment of her parental rights to K.T. An order for the involuntary termination of Brown's parental rights to K.T. was issued on September 8, 2006. K.T. was later adopted.

Returning to the present case, a fact-finding hearing on the CHINS petition with regard to C.T. was held on April 16, 2007. The juvenile court entered an order on May 4, 2007, finding C.T. to be a CHINS as to Thompson, but withheld its adjudication as to Brown pending paternity testing results. A dispositional hearing was held on June 13, 2007. Neither Thompson nor Brown was present at the hearing because both were incarcerated; however, both were represented by counsel. Following the dispositional hearing, the juvenile court issued an order finding Brown to be the biological father of C.T., as per DNA testing. The dispositional order also adjudicated C.T. to be a CHINS as to Brown, ordered C.T. to be made a ward of MCDCS, and formally removed C.T. from both parents' care and custody.

On June 27, 2007, the juvenile court conducted a hearing on MCDCS's motion, made pursuant to Indiana Code Section 31–34–21–5.6, wherein MCDCS requested

that it no longer be required to make reasonable efforts to reunify Thompson with C.T. Following the hearing, the juvenile court granted MCDCS's motion. MCDCS filed its petition for the involuntary termination of the parent-child relationship between C.T. and both Thompson and Brown on September 28, 2007.

A two-day fact-finding hearing on MCDCS's involuntary termination petition commenced on January 2, 2008, was continued on February 11, 2008, and concluded on February 13, 2008. Thompson was present and represented by counsel. Brown was not present because of his incarceration, but was represented by counsel. Several weeks prior to the termination hearing, Brown's attorney filed a motion to continue requesting the juvenile court postpone the termination hearing until Brown was released from prison, which was scheduled to occur in April 2008. The juvenile court denied Brown's motion on December 28, 2007.

As a preliminary matter, Brown's attorney renewed his request for a continuance immediately prior to the commencement of the evidentiary hearing. Brown's motion was denied. At the conclusion of the evidentiary hearing, the juvenile court took the matter under advisement. On February 20, 2008, the juvenile court issued its judgment terminating both Thompson's and Brown's parental rights to C.T. This appeal ensued.

## Analysis

### I. Sufficiency of the Evidence

Initially, we note our standard of review. This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind.Ct.App.2001). When reviewing the

---

**2.** The record is unclear as to whether paterni-

ty as to K.T. was ever legally established.

termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 264 (Ind.Ct.App.2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id. In re L.S.*, 717 N.E.2d 204, 208 (Ind.Ct.App. 1999), *trans. denied.*

■ Here, the trial court made specific findings and conclusions in terminating Thompson's and Brown's parental rights. Where the juvenile court enters specific findings of fact and conclusion thereon, we apply a two-tiered standard of review. First, we must determine whether the evidence supports the findings. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind.2005). Secondly, we determine whether the findings support the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *L.S.*, 717 N.E.2d at 208. A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. *D.D.*, 804 N.E.2d at 264. A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996). If the evidence and inferences therefrom support the juvenile court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

■ "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct.App.1996), *trans. denied.* However, the juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances sur-

rounding the termination. *K.S.*, 750 N.E.2d at 837. Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id.* at 836.

■ In order to terminate a parent-child relationship, the State is required to allege:

(A) one (1) of the following exists:

 (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

 (ii) a court has entered a finding under IC 31–34–21–5.6 that reasonable efforts for family preservation or reunification are not required . . .; or

 (iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;

(B) there is a reasonable probability that:

 (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

 (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind.Code § 31–35–2–4(b)(2). The State must establish each of these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind.1992). If a trial court finds the allegations in a termi-

nation petition "described in section 4 of this chapter are true, the court shall terminate the parent-child relationship." I.C. § 31–35–2–8.

Thompson and Brown make separate allegations on appeal concerning the sufficiency of the evidence supporting the juvenile court's termination order. Although Thompson and Brown both assert MCDCS failed to present sufficient evidence to establish (1) that a reasonable probability exists that the conditions resulting in C.T.'s removal and continued placement outside each parent's care will not be remedied, and (2) that termination of both Thompson's and Brown's parental relationship with C.T. is in C.T.'s best interests, they do so for different reasons. In addition, Brown claims he was denied his constitutional right to due process when the juvenile court denied his motion to continue the termination hearing until such time as he could attend in person.

### A. Conditions Will Not Be Remedied

Thompson and Brown each claim MCDCS failed to prove by clear and convincing evidence that there is a reasonable probability the conditions resulting in C.T.'s removal from their respective care will not be remedied. Specifically, Thompson states MCDCS removed C.T. from her care "because he tested positive for cocaine at birth and because [she] failed to complete services in cases involving other children." Appellant Thompson's Br. p. 20. Thompson goes on to state that C.T.'s continued placement outside her care was due to her "incarceration, drug use, lack of parenting skills, and unaddressed mental health issues." *Id.* Thompson insists, however, that MCDCS "presented no evidence [she] had failed to remedy these concerns at the time of the fact-finding hearing." *Id.* Thompson also challenges several of the trial court's findings, claiming they "are either unsupported by or

mischaracterizations of the evidence." *Id.* at 17.

Brown argues that "[a]lthough prior to incarceration . . . his rights to two children [were] terminated because he failed to complete services, there is no evidence here that upon his release from prison he will not be able to complete services and parent C.T." Appellant Brown's Br. pp. 3–4. Brown further asserts he is "entitled to the opportunity to prove that he can parent [C.T.] when he is released from prison." *Id.* at 4. Both parents' arguments are unavailing.

When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind.Ct.App.2001), *trans. denied.* The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6, 13 (Ind.Ct.App.2000). MCDCS is not required to rule out all possibilities of change; rather, it need establish "only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind.Ct.App.2007).

### 1. Thompson

In determining there is a reasonable probability that Thompson's behavior will not change and that the conditions resulting in C.T.'s removal and continued placement outside her care will not be remedied, the juvenile court made the following pertinent findings:

2. A Petition Alleging Children in Need of Services "CHINS" was filed on [C.T.] ... [on] December 5, 2006.... Allegations in the Petition included [C.T.] testing positive for cocaine at birth. In addition, [Thompson] had an extensive history with MCDCS and had an open [CHINS] file regarding her older children in which she had failed to complete rehabilitative services toward reunification....

3. ... [C.T.] was the fourth child born to [Thompson] that tested positive for illegal substances.

4. The Fact[-]Finding Court also found that [Thompson] had her parental rights involuntarily terminated over two siblings of [C.T.] and one half-sibling, those being [Ty.T.], [C.T.B.], and [T.T.] respectively. [Thompson's] rights were terminated over these three children on November 4, 2005....

5. MCDCS filed a motion to exclude reasonable services for reunification as to [Thompson] and the [CHINS] Court granted the motion....

6. The only referral for services made by MCDCS was for a drug and alcohol assessment[,] which [Thompson] did not do between December of 2006 and February 27, 2007[,] at which time she was incarcerated.

7. [Thompson] was convicted of Battery by Bodily Waste and was sentenced to 427 days executed with 365 days suspended. She was released from jail on November 11, 2007[,] and is on probation until November of 2008.

8. [Thompson] has been diagnosed as suffering from Type One Bi–Polar, Mixed, and Remittent. She is currently receiving medication from Community Health Network. Although [Thompson] stated she was taking Prozac, Invega, Seroquel and Symbyax, only Prozac and Invega are prescribed at this time.

9. Upon release from jail, [Thompson] immediately went to a woman's therapy group through Gallahue Community Mental Health. [Thompson] attended this weekly group consistently but has missed two of her last four sessions. Jessica Sowers is a case manager with Gallahue and conducted the weekly, one and one-half hour sessions. Ms. Sowers described the group as voluntary, used for support[,] ... helps the patient with activities of daily living[,] and gives the person something to do. Ms. Sowers explained that this group is not a substitute for individual therapy[,] which is more intense and addresses symptomatology issues. [Thompson] attended this group prior to her arrest and incarceration in February 2007.

10. Ms. Sowers noted that [Thompson] had a hard time following through on goals and recommendations. She felt that the women's group had not helped [Thompson] to improve.

11. Although [Thompson] testified that she had never used illegal drugs, she has one conviction for Dealing in Cocaine, two convictions for Possession of Marijuana or Hash, one conviction for Possession of Cocaine, and a pending case for Possession of Cocaine that was filed April 24, 2007.... In addition, four of her five children were born testing positive for illegal substances. No documentation was presented at trial evidencing that [Thompson] has ever completed substance abuse treatment. Personnel at

Gallahue recommended that [Thompson] enroll in substance abuse therapy and [Thompson] testified at the first trial setting in this cause that she would start substance abuse treatment the following week. She did not. [Thompson] stated she did not attend substance abuse treatment because there was "no sense in it" and would go if it was court ordered.

12. [Thompson] currently resides in a two[-]bedroom home with her mother. She does not pay rent and her mother takes care of her, although the relationship between [Thompson] and her mother is up and down as described to Ms. Sowers. [Thompson] has seasonal work doing odd jobs at construction sites. Since [Thompson] gets paid in cash and does not report her earnings to the IRS[,] there is no documentation of the exact amount that she earns. She did not know how much she made in December of 2007[,] but stated she probably makes $1,000 per month.

13. [Thompson] completed eight weeks of parenting classes but did not receive a certificate of completion because she owes $88.00. Instead of taking classes geared toward infants such as [C.T.], Thompson exhibited poor judgment by taking classes on adolescents because her oldest child, now adopted, was an adolescent.

14. [Thompson] exercised weekly visits with [C.T.] until her incarceration in February of 2007. Visitations were formally suspended on May 4, 2007[,] until [Thompson] could produce three consecutive negative screens. [Thompson] has not seen [C.T.] since February of 2007.

15. There is a reasonable probability that the conditions that resulted in [C.T.'s] placement outside the home will not be remedied by [Thompson]. The issue of [Thompson's] long history of substance abuse, exhibited by criminal convictions and drug positive births has not been addressed. This is a major concern because [Thompson] denied, in court, that she did drugs or had a drug problem. She has been unsuccessful in services provided by the MCDCS since her first CHINS case was filed in April of 2004. She did not attend a drug and alcohol assessment in [C.T.'s] CHINS proceeding prior to being incarcerated. She has failed to attend substance abuse classes since her release in November of 2007. She has taken urine screens through probation but results of the screens were not presented. She admitted to her Gallahue doctor to having a craving and a feeling of futility over staying sober in January of 2008. The same month, she spoke to Ms. Sowers of using drugs and [indicated] that it did not matter because she did not have her kids. [Thompson's] past history, and current situation and lack of an attempt to rectify it, make it highly improbable that given more time, she will be able to remedy her substance abuse issues to appropriately parent in a safe manner.

16. The Court finds concerns as to the mental health status of [Thompson] and her ability to safely parent. At this point, [Thompson] still lacks insight [as] to why she was arrested and why her five children became wards of the [S]tate. Her explanation was that the police

were just mean, and the case managers were mean and just wanted to hurt her.

Appellant Thompson's App. pp. 11–13. Our review of the record reveals that clear and convincing evidence supports the juvenile court's findings and conclusions set forth above. These findings, in turn, support the court's ultimate decision to terminate Thompson's parental rights.

 Thompson claims that the juvenile court's sixth finding is unsupported by the evidence because MCDCS caseworker Anne Downing conceded that "neither [Thompson's] pre-dispositional report nor any court order required [Thompson] to undergo a drug and alcohol assessment." Appellant Thompson's Br. pp. 17–18. The record reveals, however, that although Downing admitted on cross-examination there was no court order or recommendation in the pre-dispositional report that Thompson undergo a drug and alcohol assessment, Downing testified that prior to making the pre-dispositional report she had in fact made a referral for Thompson to participate in a drug and alcohol assessment, which Thompson failed to do. Thus, contrary to Thompson's argument on appeal, the juvenile court's finding number six is supported by the evidence. With regard to the remaining challenged findings, Thompson argues that the juvenile court's findings are a mischaracterization of the evidence presented during the termination hearing. A thorough review of the evidence, however, leaves us otherwise convinced.

Thompson's alleged changed conditions include her recent release from prison, current employment, residence in a two-bedroom home owned by her mother, participation in weekly group therapy, compliance with medication, completion of a parenting class, and elimination of her long-standing substance abuse problem. These allegations regarding Thompson's change in conditions, however, are either based solely upon Thompson's self-serving testimony or are directly contradicted by other evidence, including Thompson's own testimony. For example, Thompson repeatedly testified that she did not have a past or current substance abuse problem. Thompson also denied in open court that she had ever used illegal drugs despite having multiple drug-related convictions and despite the fact four of her five children tested positive for either cocaine or marijuana at the time of their birth. Although Thompson claims to have been drug-free since her release from prison, this self-serving testimony was uncorroborated because Thompson failed to provide MCDCS and the juvenile court with the results of her alleged recent drug screens, both prior to and at the time of the termination hearing.

Thompson also testified that her mother was willing to support her and was "ready" to continue to allow both she and C.T. to live with her. Tr. p. 37. However, when later asked to describe her relationship with her mother, Thompson acknowledged that her mother "yells" at her "[a]ll the time." *Id.* at 244. Thompson further admitted that she didn't know whether her mother wanted Thompson to continue to live with her because Thompson's mother had never actually told Thompson that she did. The uncertainty of Thompson's living arrangements was confirmed by Jessica Sowers, Thompson's support group leader from Gallahue Community Mental Health ("Gallahue"). Sowers testified that Thompson's relationship with her mother was, according to Thompson, "an up and down relationship where they [would] fight" and not get along "for large time periods." *Id.* at 163–64. Sowers further testified that Thompson had reported her mother had either kicked her out in the

past, or had threatened she was going to do so.

Thompson testified during the termination hearing that she was currently "self-employed" as a "self contractor" and made approximately one thousand dollars ($1,000.00) per month. *Id.* at 21–22. Thompson contradicted herself, however, when she later admitted on cross-examination that she "generally [doesn't] work in the winter[,]" and stated, "I'll go back to work when it warms up in March." *Id.* at 22, 117. Mother's lack of stable employment was corroborated by Sowers, who testified that on a number of occasions during support group meetings Thompson's self-professed weekly goal was "to get a job." *Id.* at 185. Sowers further stated that, to her knowledge, Thompson had never followed up with her recommendation to talk with the Gallahue case management team, which could provide Thompson with "supportive employment services." *Id.* Finally, Thompson admitted that the parenting class she reportedly completed was for parents of adolescents, and thus was not age-appropriate for parents of young children such as one-year-old C.T. Thompson was unable to provide the court with a certificate of completion, however, because she had failed to finish paying for the course.

In addition to Thompson's own contradictory testimony, some of the most powerful evidence weighing against her allegation that she had remedied the conditions resulting in C.T.'s removal came from additional testimony by Sowers, Thompson's own witness. For example, Sowers testified that Thompson continues to have "limited insight" into her mental illness despite her regular participation in the Gallahue support group. *Id.* at 179–80. Sowers also clarified that she was not "therapeutically treating" Thompson's mental health issues, nor did the support group address

Thompson's "symptomology." *Id.* at 189, 221. Moreover, Sowers stated Thompson had not taken responsibility for what happened with her children but instead insists she "[doesn't] know why" MCDCS removed the children from her care. *Id.* at 182, 184. Thompson's refusal to accept responsibility is further evidenced by her own statement that MCDCS "always takes my kids from me. Kidnap them or whatever." *Id.* at 19.

Finally, Sowers expressed concern with the way Thompson had been using sleep as a coping skill, stating it could "exacerbate [her] depression[.]" *Id.* at 196. Sowers further testified that she felt Thompson was "at risk of relapse, using drugs[,]" and stated she had recommended Thompson participate in a substance abuse program on several occasions, but that Thompson had failed to do so. *Id.* at 191–93.

A juvenile court "must assess the parent's ability to care for the children as of the date of the termination hearing." *Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d 615, 621 (Ind.Ct.App.2006), *trans. denied.* Based on the foregoing, we conclude that clear and convincing evidence supports the juvenile court's findings and ultimate determination that there is a reasonable probability the conditions resulting in C.T.'s removal and continued placement outside Thompson's care will not be remedied. Although we acknowledge and applaud the efforts Thompson has made to change her life since being released from prison, the juvenile court was within its discretion to judge Thompson's credibility and to weigh her testimony of changed conditions against the significant evidence demonstrating (1) her habitual pattern of conduct in failing to address her parenting and mental health deficiencies, (2) her long-standing addiction to illegal drugs, and (3) her past and present inability to

provide a safe, stable, and nurturing home environment for C.T. Thompson's arguments to the contrary, including her complaints regarding various specific findings by the trial court, amount to an invitation to reweigh the evidence, and this we may not do. *D.D.*, 804 N.E.2d at 264.

Notwithstanding our conclusion regarding the sufficiency of the evidence supporting the juvenile court's findings, we pause to address a serious concern raised by Thompson in her brief to this Court. Thompson complains that once the juvenile court determined that reasonable efforts to reunify Thompson and C.T. were not required pursuant to Indiana Code Section 31–24–21–5.6, MCDCS "failed to perform basic case management tasks" and in so doing "impermissibly infringed on [Thompson's] fundamental right to parent ... by ensuring [MCDCS] was blind to any progress [Thompson] may have made during the pendency of this case." Appellant Thompson's Br. pp. 10–11. In support of her argument, Thompson directs our attention to several comments made during the termination hearing by two MCDCS caseworkers.

During cross-examination, caseworker Downing admitted she had never visited Thompson's current residence or asked her for verification of employment, and further admitted she was unaware of anything Thompson had done regarding services since her release from prison. Similarly, although Thompson's current caseworker, Yameen Chestnut, testified that he had spoken with Thompson one or two times and had requested she provide documentation regarding her participation in services through Gallahue, Chestnut admitted he had not visited Thompson's home because "it didn't really matter" how many bedrooms it had. Tr. p. 85.

We agree with Thompson that a parent's constitutionally protected right to raise his or her own children does not "evaporate" once a court determines that a county department of child services is no longer required to make reasonable efforts to reunify the parent and child pursuant to Indiana Code Section 31–34–21–5.6. Appellant Thompson's Br. p. 11. We have previously explained:

> [E]ven if the trial court finds that reasonable efforts are not required, the court and [Department of Child Services] are still required to follow the statutory procedures in both CHINS and termination cases. For example, in a CHINS case, the trial court must hold a detention hearing after notifying the child's parents of the time, place, and purpose of the hearing. Ind.Code § 31–34–5–1.... In a termination of parental rights case, the court must hold a hearing wherein the [Department of Child Services] is required to present clear and convincing evidence to establish the elements of Indiana Code Section 31–35–2–4(b)(2). *Indiana Code Section 31–34–21–5.6 does not relieve [DCS] of this statutory burden.*

*G.B. v. Dearborn County Division of Family & Children,* 754 N.E.2d 1027, 1032 (Ind.Ct.App.2001) (emphasis added), *trans. denied.* Let us be clear, a finding pursuant to Indiana Code Section 31–34–21–5.6 does not abolish a parent's fundamental right to family integrity. Nor does it presuppose an automatic termination of the parent-child relationship. The procedural safeguards contained in Indiana's termination statutes are designed to ensure that parents receive a full and fair hearing before a termination of their parental rights may occur. MCDCS plays an integral part in ensuring that such procedural safeguards are strictly followed, and may not simply wash its hands of a case even

after a court has determined that reunification services are no longer required. Such a policy ensures that the best interests of our children are protected. The comments made by caseworkers Downing and Chestnut reflect a dangerous attitude—one neither condoned by this Court nor sanctioned by statute.

### 2. *Brown*

We now turn to Father's allegation that MCDCS failed to prove by clear and convincing evidence there is a reasonable probability the conditions leading to C.T.'s removal from his care also will not be remedied. In making this determination, the juvenile court made the following pertinent findings:

2. A Petition Alleging Children in Need of Services "CHINS" was filed on [C.T.] ... [on] December 5, 2006.... [Brown], at the time, did not have rights to custody and his ability and willingness to parent had not been demonstrated.

3. A Fact finding Hearing on the CHINS Petition was held on April 16, 2007[,] and an order was entered ... finding [C.T.] was a child in need of services as to both parents. Among the court's findings as to why [C.T.] was in need of services were that ... [Brown] was incarcerated at [C.T.'s] birth and remained incarcerated, and ... [Brown] had failed to complete services in prior cases.

* * *

17. The CHINS Court found [C.T.] to be in need of services as to [Brown] ... because [Brown] was incarcerated and unable to provide for [C.T.'s] custody, education, support, health, shelter, or any of his basic needs. [Brown] is still unavailable,

with a possible outdate in April of 2008.

* * *

19. [Brown's] ability to parent is unknown except for his history of not completing services in two prior CHINS cases, leading to his parental rights being terminated on at least two children.

20. [Brown] was in protective custody at the time of trial in this matter and could not participate. He could send and receive letters and corresponded weekly with [Thompson]. [Brown] did not correspond with his attorney or with a family case manager. His lack of doing so exhibits a disinterest in [C.T.'s] case.

21. There is a reasonable probability that the conditions that resulted in the removal and placement of [C.T.] outside the home will not be remedied by [Brown]. He has been in and out of jail since 2003 which precluded him from reunification with three previous children.... [Brown] has a habitual pattern of criminal activity resulting in twenty-one convictions since 1989.... Given this history and current incarceration, [Brown] would not be able to stay available and provide for a stable home and [for] [C.T.'s] needs.

Appellant Brown's App. pp. 10–13.

■ The record reveals that Brown was incarcerated and therefore was unavailable to parent C.T. when C.T. was initially removed from Thompson's care in December 2006. Brown, who has a significant criminal history including twenty-one convictions, remained unavailable throughout the majority of the CHINS proceedings as a result of being in and

out of prison. Additionally, in two prior CHINS proceedings, Brown failed to avail himself of court-ordered reunification services, and his failure to do so ultimately resulted in the termination of his parental rights to C.T.'s siblings. By the time of the termination hearing in the present case, Brown had failed to complete any of the dispositional goals specified in the pre-dispositional report and was once again incarcerated. Consequently, Brown remained unavailable to parent C.T.

A court must assess a parent's ability to care for his or her child "as of the date of the termination hearing." *Rowlett*, 841 N.E.2d at 621. Based on the foregoing, we conclude that the juvenile court's determination there is a reasonable probability the conditions resulting in C.T.'s removal and continued placement outside Brown's care will not be remedied is supported by clear and convincing evidence. *See Lang v. Starke County Office of Family & Children*, 861 N.E.2d 366, 372 (Ind.Ct.App. 2007) (concluding that "[a] pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support[s] a finding that there exists no reasonable probability that the conditions will change"), *trans. denied; see also Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind.Ct.App.2006) (concluding that trial court did not commit clear error in finding conditions leading to child's removal from father would not be remedied where father, who had been incarcerated throughout CHINS and termination proceedings, was not expected to be released until after termination hearing), *trans. denied*.

■ This Court has previously recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their chil-

dren." *Id.* Moreover, a juvenile court need not wait until a child is "irreversibly influenced" such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *A.F. v. Marion County Office of Family & Children*, 762 N.E.2d 1244, 1253 (Ind.Ct.App.2002), *trans. denied*. C.T. should not be required to continue to wait until Brown is willing and able to care for him. Under the facts of this case, C.T. has waited long enough. *See In re Campbell*, 534 N.E.2d 273, 275 (Ind.Ct.App.1989) (stating that county welfare department does not have to rule out "any possibility" of change and concluding that approximately two years without improvement is "long enough").

### B. Best Interests

■ Next we address Thompson's and Brown's claims that termination of their parental rights is not in C.T.'s best interests. In making this assertion, Thompson claims the record "contains little evidence about [her] home, employment or interaction with [C.T.]" except for the facts Thompson lives with her mother in a two-bedroom home where the utilities are paid and where there is food and clothing for C.T. Appellant Thompson's Br. p. 22. Thompson therefore concludes there is insufficient evidence supporting the juvenile court's finding that termination of her parental rights is in C.T.'s best interest. Brown argues "[t]here would be little if any impact on C.T. if the wardship was continued for a few more months until [he] was released from prison and had a chance to complete services and show he was fit to parent C.T." Appellant Brown's Br. p. 10.

■ We are mindful that in determining what is in the best interests of the child, the court is required to look beyond the factors identified by MCDCS and to look to the totality of the evidence.

*McBride v. Monroe County Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct.App.2003). In so doing, the juvenile court must subordinate the interests of the parent to those of the children. *Id.* In addition, previously, we have determined that the recommendations of the caseworker and court appointed special advocate ("CASA") that parental rights be terminated support a finding that termination is in the child's best interest. *Id.*

Chestnut testified that he felt termination of both Thompson's and Brown's parental relationships with C.T. would be in C.T.'s best interest. In so doing, Chestnut explained that C.T. was currently placed with two of his biological siblings in a pre-adoptive foster home. Chestnut further testified, "C.T. is bonded with his foster care placement. . . . He's doing just great. His development overall is going well. And being with [his] sibling[s] is important." Tr. p. 77. Additionally, CASA Michelle McNeil informed the court that she had visited C.T. in his current foster home on several occasions and had observed C.T. interact with his foster parents and their children. McNeil went on to testify that C.T.'s foster mother was "very attentive" to C.T. and that his needs were being met. *Id.* at 99. McNeil further acknowledged that she was in agreement with MCDCS's permanency plan for C.T., namely, that he be adopted by his current foster parents.

Based on the totality of the evidence, including (1) Thompson's failure to remedy the conditions resulting in C.T.'s removal from her care, (2) Brown's chronic and current incarceration, and (3) both parents' prior history with MCDCS, coupled with the testimony from Chestnut and McNeil recommending termination and adoption, we cannot conclude that the juvenile court's determination that termination of both Thompson's and Brown's parental rights is in C.T.'s best interests is clearly erroneous. *See In re A.I.,* 825 N.E.2d 798, 811 (Ind.Ct.App.2005) (concluding that the testimony of the CASA and the family case manager, coupled with the evidence that the conditions resulting in the continued placement outside the home will not be remedied, is sufficient to prove by clear and convincing evidence that termination is in the child's best interest), *trans. denied.*

### II. Procedural Due Process

 Finally, we consider Brown's assertion he was denied due process of law when the juvenile court denied his motion to continue the termination hearing. The decision to grant or deny a motion to continue rests within the sound discretion of the juvenile court. *Parmeter v. Cass County Dep't of Child Servs.,* 878 N.E.2d 444, 449 (Ind.Ct.App.2007). Therefore, we will not disturb the court's ruling absent a showing of clear and prejudicial abuse of that discretion. *Id.* Notwithstanding our deferential standard of review, we have previously explained:

> The Due Process Clause of the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. The nature of the process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure.

*In re C.C.,* 788 N.E.2d 847, 852 (Ind.Ct. App.2003) (citations omitted), *trans. denied.*

In termination cases, both the private interests of the parents and the countervailing governmental interests that are affected by the proceeding are substantial. *Id.* In particular, a termination action affects a parent's interest in the care, custody, and control of his or her child, which has been repeatedly recognized as one of the most valued relationships in our society. *Id.* As such, a parent's interest in the accuracy and justice of the decision is a commanding one. *In re E.E.,* 853 N.E.2d 1037, 1043 (Ind.Ct.App.2006), *trans. denied.*

On the other hand, the State's *parens patrie* interest in protecting the welfare of a child is also significant. *D.A. v. Monroe County Dep't of Child Servs.,* 869 N.E.2d 501, 510 (Ind.Ct.App.2007). "Although the State does not gain when it separates children from the custody of fit parents, the State has a compelling interest in protecting the welfare of the child by intervening in the parent-child relationship when parental neglect, abuse, or abandonment are at issue." *Tillotson v. Clay County Dep't of Family & Children,* 777 N.E.2d 741, 745 (Ind.Ct.App.2002) (quotation omitted), *trans. denied.* Delays in the adjudication of a termination case "impose significant costs upon the functions of the government as well as an intangible cost to the lives of the children involved." *D.A.,* 869 N.E.2d at 510.

Here, C.T. was physically removed from his parents and placed in foster care in December 2006. The termination hearing did not commence until January 2, 2008. Brown, who had been incarcerated throughout the majority of the CHINS case, remained incarcerated at the time of the termination hearing and was not expected to be released from prison until sometime in April 2008. Thus, a significant amount of time had passed since C.T.'s initial removal. Had the juvenile court granted Brown's request for a continuance, C.T. would have had to continue to wait for at least four additional months before a termination could even commence. Although continuances may be necessary in certain situations to ensure the protection of a parent's due process rights, we have previously held that "courts must also be cognizant of the strain these delays place upon a child." *C.C.,* 788 N.E.2d at 853.

When balancing the competing interests of a parent and the State, we must also consider the risk of error created by the challenged procedure, namely, Brown's absence from the termination hearing. *E.E.,* 853 N.E.2d at 1043. Indiana Code Section 31–35–2–6.5(e) states that a court shall provide a party with an "opportunity to be heard ... at the hearing." However, this statutory provision does not create a constitutional right for Brown to be physically present at the termination hearing. *See E.E.,* 853 N.E.2d at 1044 (stating that parent does not have a constitutional right to be present at a termination hearing); *see also J.T.,* 740 N.E.2d at 1264 (stating incarcerated parent has no absolute right to be physically present at the termination hearing).

In the present case, Brown was represented by counsel throughout the entire termination hearing. Brown's counsel was provided with the opportunity to cross-examine the State's witnesses, and in fact did so, as well as the opportunity to introduce evidence in defense of the action. Under these circumstances, we have recognized that the risk of an inaccurate result decreases significantly. *See id.* Brown counters that the facts in the present case indicate "a greater risk of error even though [Brown] was represented by counsel because [Brown's] counsel was not able to confer with [Brown] about the termination case" prior to the evidentiary hearing. Appellant Brown's Br. p. 5. We disagree.

The record reveals Brown received actual notice of the termination hearing and signed the original advisement of rights form. Brown then attached a handwritten letter requesting a continuance of the termination hearing until sometime after his release from prison. However, Brown stated in his letter "[I] don't want to be transported at this time." Appellant Brown's App. p. 26. Brown then wrote, "P.S. Could you please advise the court to not send transport order...." *Id.* The record also reveals that Brown maintained "regular" contact with Thompson, who testified that Brown wrote to her approximately "once a week[.]" Tr. pp. 236–37. Thompson further indicated that "as far as [she] could tell from [Brown's] responses in his letters[,]" it appeared Brown had received Thompson's letters as well. *Id.* at 237. Despite Brown's actual notice of the termination hearing and his apparent ability to communicate through mail, however, Brown failed to communicate with his attorney prior to the termination hearing. In fact, Brown's attorney informed the court that he had attempted to contact Brown and had "sent [Brown] at least three letters[,]" but that Brown had failed to respond. *Id.* at 6.

The doctrine of invited error, grounded in estoppel, provides that a party may not take advantage of an error that he commits, invites, or which is the natural consequence of his own neglect or misconduct. *Breining v. Harkness,* 872 N.E.2d 155, 159 (Ind.Ct.App.2007), *trans. denied.* In failing to respond to his attorney's letters or to communicate with his attorney prior to the termination hearing, despite his actual knowledge of the hearing, Brown has invited the alleged error of which he now complains. Error invited by the complaining party is not reversible error. *Szpunar v. State,* 783 N.E.2d 1213, 1217 (Ind.Ct.App.2003). We also observe that Brown fails to allege any specific prejudice that resulted from his absence from the termination hearing. We therefore conclude that the risk of error caused by the juvenile court's denial of Brown's motion to continue was minimal.

After balancing the substantial interest of Brown with that of the State and in light of the minimal risk of error created by the challenged procedure, we conclude that the juvenile court's denial of Brown's attorney's request for a continuance and its decision to proceed in Brown's absence was not an abuse of discretion. Nor did the juvenile court's decision deny Brown due process of law.

### Conclusion

Clear and convincing evidence supports the juvenile court's judgment terminating Thompson's and Brown's parental rights to C.T. The MCDCS is cautioned, however, that a juvenile court's determination that reunification services are no longer required pursuant to Indiana Code Section 31–35–21–5.6 does not abolish a parent's fundamental right to family integrity. Nor does such a determination absolve MCDCS of its responsibility to properly oversee and manage the case. Finally, after balancing the substantial interests of both Brown and the State as they relate to the termination hearing, and in light of the minimal risk of error created by the challenged procedure, we conclude that the juvenile court did not abuse its discretion, nor was Brown denied due process of law, when the court denied Brown's motion to continue and proceeded with the termination hearing in his absence. Accordingly, we affirm

Affirmed.

FRIEDLANDER, J., and DARDEN, J., concur.