# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**STEVEN J. HALBERT**
Carmel, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

**FILED**

Jan 25 2013, 9:55 am

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE INVOLUNTARY )
TERMINATION OF THE PARENT-CHILD )
RELATIONSHIP OF: )
                                                      )
D.T. (Minor Child), )
    )
    and )
    )
T.S. (Father), )
    )
    Appellant-Respondent, )
    )
        vs. )    No. 49A02-1205-JT-420
    )
THE INDIANA DEPARTMENT OF )
CHILD SERVICES, )
    )
    Appellee-Petitioner. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gary Chavers, Judge ProTempore
The Honorable Julie Cartmel, Magistrate
Cause No. 49D09-1108-JT-33069

**January 25, 2013**

**OPINION - FOR PUBLICATION**

**ROBB, Chief Judge**

<u>Case Summary and Issue</u>

T.S. ("Father") appeals the termination of his parental rights as to D.T. and raises one issue on appeal: whether his due process rights were violated when the lower court did not appoint a Guardian ad Litem ("GAL") for Father. Concluding that his due process rights were not violated, we affirm.

<u>Facts and Procedural History</u>

On August 11, 2010, D.T. (the "Child") was born. At that time, Father was fifteen years old. Two days later, the Department of Child Services ("DCS") filed a petition alleging that the Child was a Child in Need of Services ("CHINS"). Approximately a week after birth, the Child was placed in foster care. At the initial court hearing, Father requested and was appointed a public defender. In September 2010, the Child's mother N.T. ("Mother") appeared with counsel and requested a GAL for herself; GALs were appointed for Mother and for the Child, and the Child was found to be a CHINS.[1] In October 2010, there was a disposition hearing at which the court ordered, among other things, for Father to: participate in a parenting assessment and complete all recommendations developed as a result of the assessment; participate in and complete home-based counseling, and complete all

---

[1] Mother was not a minor at the time of D.T.'s birth, but was appointed a GAL due to her lower cognitive abilities.

recommendations of counselor; secure stable income; and obtain and maintain suitable housing. The plan at that point was reunification of the Child with the parents.

On January 11, 2011, there was a placement and review hearing. Father was present at the hearing, and was represented at that hearing by Mother's attorney, who was sitting in for Father's attorney. The court noted that Father had refused to participate in services, had stated that he did not want anything to do with the Child, and home-based counseling was closed prior to completion due to his lack of participation. The court also noted that Father's mother ("Grandmother") had not been meeting with home-based services, attending meetings, or following recommendations.[2] A little further into the hearing, Mother's attorney noted a conflict of interest and stated that he was no longer representing Father. The hearing continued, and the court later noted again that Father did not want the Child, and that Grandmother complained that home-based services kept asking her questions to which they already knew the answers. The plan for permanency at the end of the hearing remained reunification with the parents.

On January 14, 2011, Father admitted to a charge of possession of marijuana, a misdemeanor if committed by an adult. In March 2011, Father's probation officer filed a petition for modification because Father had multiple absences from ordered programs and was disruptive when he was present. The record indicates that in April 2011, Father told a DCS case manager that he did not want to parent.

---

[2] There is no participation decree for Grandmother in the record. However, the record is clear that DCS and service programs were actively engaged with Grandmother and involved her in services, apparently due to a combination of Father's age, Father's reluctance to participate, and general practices to involve the

In August 2011, the court held a permanency hearing. DCS requested that the permanency plan be changed to adoption based on the lack of progress exhibited by the parents. DCS also noted that Father was recently (re)engaged with home-based services but earlier that week had told them that he did not want to participate in services, and that Father had not been communicating with home-based services or returning calls. Father's counsel objected to the change in permanency plan, and said that Father was having a bad day when he talked to home-based services earlier in the week, but that he was now willing to work with services and would like to continue working toward having the Child in his home. The Child's GAL agreed with the plan being changed to adoption, but noted that because of Father's age, services should be continued for Father and he should be allowed to continue visitation. The court ordered the plan changed to adoption with a review hearing scheduled and services to continue for Father. The court told Father that

> plan A is now that the child be adopted, but plan B is you could rally [Father] and you can get this child. You can get this child, you can parent this child, so in your young mind you've got to figure out what I want and then you have to do that . . . . but right now based upon where we are and what I find is going to be best for the child I'm going to change the plan to adoption.

Transcript at 8.

On December 13, 2011, the court held a review hearing at which it was noted that Father was not participating in parenting skill services but was visiting the Child. A home-based services representative said that she had not seen Father since November, and that he did not want to participate in services and the home-based services would therefore be

entire family where possible.

4

closed. Father's attorney noted that they were working on a waiver for Grandmother to be able to adopt the Child, because she had a prior CHINS allegation herself; the record indicates that the waiver would have been necessary not only for her to adopt the Child, but also for the Child to be placed with Father, because Father was living at home with Grandmother. The foster mother who had cared for the Child since he was about a week old stated that she wanted to adopt him. The permanency plan at the end of the hearing was for adoption.

On February 17, 2012, Father was charged with confinement and battery both with the use of a deadly weapon, as felonies, and possession of a handgun as a misdemeanor.

On March 2, 2012, an evidentiary hearing was held on the termination petition. Father testified that initially he did not want the Child, but that about two weeks after the Child was born, he decided that he did want him in his life. A case manager testified that Father had been vocally opposed to not only services but visitation until well into 2011. A home-based case manager testified that Father had been told that the services were court-ordered, and apparently made to understand that they were a pre-requisite to placement of the Child with him.

The foster mother discussed the Child's medical concerns, noting that he was on a feeding tube for the first five months or so, and had physical therapy and frequent appointments at Riley Children's Hospital to deal with developmental delays. At the time of the hearing, he was on physical therapy for mobility and was about to get leg braces to treat bowlegs; he was on developmental therapy to address age appropriate behavior; he was on

occupational therapy to work on his feeding skills— he was at risk for aspiration and his liquids had to be thickened; and he had frequent ear infections and was scheduled to have tubes put in his ears that week. He had various therapy appointments every week. The foster mother stated that when she dropped the Child off for visitation with the Father and Father's family, she made a point of telling the intermediary of upcoming appointments, and she left a note in the diaper bag with the same information. Despite that, neither Father nor Grandmother ever came to any of the Child's medical appointments. She also said that visitations with the Father were often canceled or cut short by Father. Father and Grandmother both testified that the only medical issue they were aware of was that the Child needed to have his liquids thickened.

A case manager testified that she could not recommend placement of the Child with Father because of lack of follow-through and lack of progress on goals, and Grandmother had not completed the information necessary for a waiver to place the Child in her home. She had concerns about Father's ability to parent the Child and address his medical needs. She testified that she had worked with minor parents in the past, and while they try to engage the entire family in every case, with minor parents they try especially to cater to the level of understanding of the minor parent. In this case, they had referred home-based services to Father multiple times because of his age, and his age also made the parenting skills classes very important. He was also referred to Fathers and Families, an agency directed at young fathers. She said that each referral had been made at least five times.

On April 24, 2012, the court issued an order terminating the parent-child relationship of Father to the Child.[3] The court found, among other things, that Father had made no effort to learn any skills or to demonstrate the willingness or ability to address the Child's medical needs; Father refused to participate in services or training; Father would periodically state that he would like to learn to parent the Child, but would make only cursory efforts to participate in services and would completely fail to participate in any training to care for the Child's medical needs; Father resides with Grandmother and Grandmother has refused to permit background checks; Father stated that he did not need to learn to parent the Child because his family would be there to do it; Father continues to engage in delinquent activity; and continuation of the parent-child relationship poses a risk to the Child and termination of the relationship is in the best interest of the Child. This appeal followed.

Discussion and Decision

I. Standard of Review

The Due Process clause of the U.S. Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. When the State terminates a parent-child relationship, it must do so in a manner that meets the requirements of due process. C.T. v. Marion Cnty. Dept. of Child Servs., 896 N.E.2d 571, 586 (Ind. Ct. App. 2008), trans. denied. Due process within the context of termination of a parent-child relationship requires a balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the

---

[3] The court also terminated the relationship between Mother and the Child, but Mother does not

7

countervailing governmental interest supporting use of the challenged procedure. Id. It is well established that both the private interests and the State interests are substantial in termination cases. See id.; In re A.L.H., 774 N.E.2d 896, 900-01 (Ind. Ct. App. 2002). The factor at issue then is the risk of error.

## II. Due Process

Father argues that his due process rights were violated when the court failed to appoint him a GAL. We disagree. We do note at the outset however our disappointment with the overall care that was taken with this case. We regret that the court allowed the January 11, 2011 hearing to continue without Father's counsel present, particularly after Mother's counsel noted a conflict and stated that he could no longer stand in for Father's counsel. We also agree with Father that the participation decree could have been better tailored to a minor parent and that the language regarding employment and housing was not written with a minor parent in mind. However, Father also failed to meet the other, reasonable, requirements of the decree— in particular, he failed to actively participate in or complete services, despite being given multiple chances over the course of eighteen months. Because of that, in light of the standard of the best interests of the child, we agree with the overall and final determination of the juvenile court.

Father contends that a GAL would have insisted that the obligations imposed on Father be tailored to a minor, and would have understood how important the choices made at the initial CHINS hearing are. We observe that while the obligations were not well tailored

appeal.

to a minor, the court emphasized Father's failure to meet obligations that <u>were</u> appropriate for a minor. Additionally, Father was given multiple referrals to multiple different services throughout the eighteen months leading up to termination, in large part out of respect for his age. It was the sum total of Father's lack of participation that largely informed the court's opinion, and not choices that were made at any one hearing.

DCS correctly argues that issues not timely raised below are waived on appeal, but also notes that waived issues may nonetheless be addressed on appeal if they qualify as fundamental error. <u>Manuel v. State</u>, 793 N.E.2d 1215, 1218 (Ind. Ct. App. 2003), <u>trans. denied</u>; <u>see also</u> <u>In re K.S.</u>, 750 N.E.2d 832, 834 (Ind. Ct. App. 2001). It does not appear that Father raised the issue of appointment of a GAL below. To qualify as fundamental error, an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible and must constitute a blatant violation of basic principles. <u>Manuel</u>, 793 N.E.2d at 1218. The harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process. <u>Id.</u>

We must determine whether any risk of error created by not providing Father with a GAL tips the balance in favor of a determination that Father was denied due process. For several reasons, we determine that it does not. Firstly, we note that Indiana law requires that a GAL be appointed to represent and protect the best interests of a child when a child is alleged to be a CHINS. Ind. Code § 31-34-10-3. However, that statute applies to the child who is the subject of the CHINS allegation. <u>See</u> <u>In re A.L.H.</u>, 774 N.E.2d at 901.

9

We have previously stated that termination proceedings are civil in nature, and are therefore governed by the Indiana Rules of Trial Procedure. Crayne v. M. K. R. L., 413 N.E.2d 311, 313 (Ind. Ct. App. 1980). Trial Rule 17 requires that "[i]f an infant or incompetent person is not represented, or is not adequately represented, the court shall appoint a guardian ad litem for him." In the present case, Father was represented by counsel at all hearings except for the final half of the hearing at which Mother's counsel was sitting in for Father's counsel, as noted above. Additionally, Father's mother appears to have been present at most hearings, and to have been involved in the case. The record does not indicate, and Father does not contend, that he was inadequately represented. It was therefore not required that the court appoint a GAL to Father. Father argues that a GAL should have been appointed under Indiana Code section 31-32-3-11, which states that "[t]he juvenile court may appoint a guardian ad litem or a court appointed special advocate, or both, for the child at any time." DCS argues that this section applies only to the child who is the subject of a CHINS allegation. We disagree with DCS that this section is limited to CHINS cases; rather, it is Indiana Code section 31-34-10-3 that is within the CHINS Article of the code and applies only to the child who is the subject of a CHINS allegation. Section 31-32-3-11 could have applied to Father, but the wording clearly indicates that appointment of a GAL under that section is discretionary, and for the reasons outlined above, we do not believe the court was required to appoint a GAL for Father. Because the court did appoint a GAL to both Mother and the Child,[4] the court must have been aware not only of the statutory requirement

_____

[4] DCS cites to Indiana Code section 29-3-2-1as the section under which Mother's GAL was

10

of a GAL in some situations, but the court must also have been willing to assign a GAL when appropriately requested even where the subject was represented by counsel, as Mother was. The record does not indicate, and Father does not argue, that he ever requested a GAL at any point in the process.

We conclude that any risk of error created by not providing Father with a GAL was low. Father was represented by counsel,[5] and Father's mother was involved in the process. Father makes statements about what a GAL would have done and how things would then have been different, but we are not convinced. Father was given multiple chances to participate in services and learn to parent the Child, but declined to do so. The record indicates that Father chose not to participate in services, not that he did not participate because he was unaware that the proscribed steps were necessary if he wanted to maintain his relationship with the Child. The juvenile court properly determined that the best interests of the Child would be best served by terminating the relationship between Father and the Child and allowing the Child to be adopted. There was no fundamental error, and Father's due process rights were not violated when the court failed to appoint a GAL to him.

---

appointed. However, Title 29 deals with probate and is not relevant to the instant case. Exactly which code section was used to appoint Mother's GAL is immaterial, and Trial Rule 17 would apply to Father.

[5] For the hearing at which Father was not represented for the final half, the plan for permanency at the end of the hearing was still reunification. Moreover, it appears that most of the court's focus on Father occurred during the first portion of the hearing, when he was ostensibly represented by Mother's counsel. This was not a hearing in which the plan for permanency changed or where new obligations were imposed on Father, nor was it the trial where evidence regarding termination was heard. While we do not approve of the lower court's handling of the representation situation that day, we also do not find any resulting error in the later termination of Father's parental rights.

## Conclusion

Concluding that Father's due process rights were not violated, we affirm.

Affirmed.

MAY, J., and PYLE, J., concur.