**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANTS:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEY FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: D.T. (minor child) and J.T. (mother), | ) ) ) ) |
| Appellants, | ) ) |
| vs. | ) No. 79A04-1108-JT-483 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee. | ) ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas K. Milligan, Senior Judge
Cause No. 79D03-11069-JT-76

**April 4, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

<u>STATEMENT OF THE CASE</u>

J.T. ("Mother") appeals the termination of her parental rights as to her minor child,

D.T.[1]

We affirm.

<u>ISSUE</u>

Whether there was clear and convincing evidence to support the termination of Mother's parental rights.

<u>FACTS</u>

D.T. was born on December 26, 2004. In February of 2010, Mother and D.T. moved in with Mother's father, S.K. ("Grandfather"), and step-mother, T.K. ("Grandmother"). Subsequently, on July 19, 2010, the Tippecanoe County's office for the Indiana Department of Child Services ("DCS") received a report that the adults were using methamphetamine and marijuana; Grandmother was selling prescription drugs out of the home; and that the adults often left D.T. alone while they went out to buy drugs.

Mother admitted to smoking marijuana in the home but denied using methamphetamine after D.T.'s birth. Mother submitted to both a hair and urine drug screen. Mother's hair screen tested positive for methamphetamine and marijuana; her urine tested positive for THC. Grandfather and Grandmother refused to submit to hair

---

[1] The trial court also terminated the parental rights of J.P. ("Father"). He does not appeal the termination.

screens. Grandmother's urine, however, tested positive for marijuana. Both Grandfather and Grandmother had substantiated history with DCS.

DCS filed a petition, alleging D.T. to be a child in need of services ("CHINS") due to Mother's drug use. Mother denied the allegations. On July 26, 2010, the trial court held a detention hearing, after which it authorized the removal of D.T. and placement in a foster home.

Following a hearing on September 1, 2010, the trial court found D.T. to be a CHINS. The trial court also entered a parental participation decree, ordering Mother to, among other things, attend all hearings, case conferences, visitations and appointments; "[n]ot consume or possess, nor allow anyone else in [the] home to consume or possess, any legend drug or controlled substance without a prescription"; submit to random drug screens; "[o]btain and maintain a legal and stable source of income"; "participate in residential substance treatment, Seeds of Hope, and follow recommendations"; "participate in a psychiatric evaluation and follow all recommendations;" "participate in family preservation/home-based case management services to include weekly assignments"; obtain her general education degree ("GED"); obtain "independent housing"; "complete a substance abuse evaluation and treatment through Turning Point"; "participate in a mental health evaluation and follow all recommendations"; and participate in supervised visitation with D.T. (DCS's Ex. 1). The trial court also appointed a court-appointed special advocate ("CASA").

3

On October 23, 2010, DCS filed a request for rule to show cause, asserting that Mother had tested positive for marijuana on October 5, 2010 and admitted to using "spice," a synthetic drug that mimics the effects of marijuana. The trial court held a review and show cause hearing on November 3, 2010. Finding Mother in contempt for failure to comply with the parental participation order, the trial court again ordered Mother to abstain from drug use; "[n]ot consume or possess, nor allow anyone in [her] home to consume or possess, any legend drug or controlled substance without a prescription"; and "become invested in her substance abuse treatment and follow all recommendations." (DCS's Ex. 1). The trial court also ordered Mother to comply with all other aspects of the parental participation decree.

DCS again filed a request for rule to show cause on January 24, 2011. The trial court held a review and show cause hearing on February 7, 2011, after which it found Mother in contempt for failing to participate in the court-ordered Seeds of Hope program. The trial court, however, did not impose any sanctions. The trial court ordered Mother to continue to comply with the parental participation decree and further ordered Mother to participate in aftercare upon completion of an intensive out-patient treatment program and participate in a medication evaluation and follow all recommendations.

The trial court held an additional review hearing on March 14, 2011, after which it ordered Mother to participate in joint therapy sessions with D.T. and "assume responsibilities as to [D.T.]'s schooling . . . ." (DCS's Ex. 2). The trial court also authorized additional visitation.

4

On June 16, 2011, DCS filed a petition to terminate Mother's parental rights. The trial court held a termination hearing on August 3, 2011.

Judith McEwen, a licensed social worker and therapist with the Seeds of Hope program, testified that DCS referred Mother to Seeds of Hope for assistance in, among other things, obtaining independent housing. McEwen provided therapy for Mother from October of 2010 until December of 2010. She testified that Mother suffered from depression and "needed much more work before she was able to parent." (Tr. 64). Specifically, Mother's "lack of energy," (tr. 64), and low motivation prevented her from parenting "in a way that would be good for any child." (Tr. 65). McEwen confirmed that Mother was kicked out of the Seeds of Hope program for failing to participate.

Barb Osborn testified that she provided therapy for both Mother and D.T. through Counseling Partners, a division of Child and Family Partners. Osborn's services also consisted of therapeutic visitation, the goal of which is to "strengthen the bonds" and relationship between the parent and child during supervised visits. (Tr. 76).

Osborn testified that Mother often failed to attend the visits; when she did attend, she often arrived late or would fall asleep during the visits. Osborn believed that Mother's behavior and inconsistent visits caused six-year-old D.T. to have "toileting issues" and "problems with attention and compliance at school . . . ." (Tr. 77). Mother also refused to engage with D.T. during visits. Mother's behavior concerned Osborn because D.T. was reluctant to ask Mother for help. Mother's lethargy also caused concern for D.T.'s safety. Osborn testified that Mother sometimes fell asleep during

5

visits and was difficult to wake. Osborn opined that termination of Mother's parental rights would be in D.T.'s best interests because he needs permanency, and "he's got to get settled and move on with his life." (Tr. 85). She testified that D.T.'s awareness that Mother is "not accessible" and that he may have to leave his foster family causes "severe anxiety[.]" (Tr. 85).

Cynthia Bauer testified that she was Mother's home-based case manager and supervised visitations. She testified that Mother missed several appointments and visits, which led to the termination of services. She further testified that she believed Mother to be under the influence during one visit, and therefore, Mother was referred for a drug screen. Mother, however, did not show up for the drug screen. Mother also lied about participating in court-ordered services. Mother also refused to follow the service providers' recommendations, including that she attend certain substance abuse programs.

D.T.'s CASA, Jill Lynn, testified that she believes termination of Mother's parental rights to be in D.T.'s best interest. Mother's lethargy and inability to wake up caused her to be concerned for D.T.'s safety. She further testified that Mother's behavior and D.T.'s feelings of not being able to rely on Mother caused severe anxiety in D.T. and that he needs permanency.

Kristen Meadows, Mother's case manager, testified that DCS referred Mother to several service providers. Mother, however, failed to comply with several court-ordered services, including therapy and visitation. Meadows also testified that Mother failed to obtain her GED and remain drug free, testing positive for marijuana one month prior to

6

the hearing. According to Meadows, Mother had several "no-show appointments" and cancelled visits with D.T. (Tr. 113). Due to Mother's sporadic visitation, DCS never implemented a home visit with Mother.

Meadows further testified that she believed Mother posed a risk to D.T. because Mother "can't or won't get out of bed in the morning; she can't wake up." (Tr. 119). Meadows expressed concern that D.T. would be harmed "in some way trying to fix a problem that he runs into or trying to, for example, . . . cook himself breakfast." (Tr. 119-20). Meadows opined that termination of Mother's parental rights would be in D.T.'s best interests because he "needs permanency" and "a stable lifestyle" while Mother lacks the motivation to get D.T. back. (Tr. 123).

Mother testified that she tested positive for marijuana a month before the hearing because she was "making out with a guy that does smoke marijuana." (Tr. 25). She further asserted that she tested positive for marijuana in October of 2010 because she had smoked "spice," and the pipe may have had marijuana in it.

Mother further testified that she only sought employment "for DCS" and had made no attempt to get her GED. (Tr. 27). She admitted to lying to Bauer regarding participating in the Lafayette Adult Resource Academy, which provides adult education. Mother had no explanation for missing visits with D.T. Mother also could not answer when asked how she planned to take care of D.T. when she is not "able to wake up in the morning[.]" (Tr. 32). Mother further admitted to missing case management visits because she slept through them or forgot. Despite Mother's depression and need for

7

treatment, Mother never sought management for her medication, as ordered by the trial court.

Mother admitted that she refused to attend Turning Point's relapse prevention program despite recommendations that she do so. Mother also admitted that the Seeds of Hope program kicked her out in January of 2011 because she refused to comply with the program requirements, including that she participate in substance abuse counseling. Thereafter, Mother lived with Grandfather and Grandmother until April, when Mother moved into a rent-subsidized apartment.

On August 4, 2011, the trial court entered its order, terminating Mother's parental rights. The trial court found, in pertinent part, as follows:

> 4.      . . . Even though [Mother] maintains she has been drug free since October 2010, she lived in the home of her father and stepmother between January and April of this year and she has been dating a man who smokes marijuana. . . . She has refused to continue relapse prevention treatment. She didn't think she needed therapy. She claims to have stopped using, and seems to think that is all she needs to do to remedy the situation that resulted in [D.T.] being removed from her care.
>
> 5.      Services started in August 2010 with a referral to Seeds of Hope, a residential treatment program . . . . That placement lasted until December when [Mother] was asked to leave for non-compliance with the program. During that period she also counseled one on one for depression and was working through Turning Point on substance abuse issues. The counseling terminated before completion because [Mother] was asked to leave Seeds of Hope and the person she was working with retired. Also she completed her IOP with Turning Point, and was asked to continue with an Alumni Group which was a relapse prevention group, but she chose not to do that even though she was ordered to follow all recommendations made. She also has been prescribed medication for her depression but does not follow up with medication management. The Court strongly suspects that she does

8

not take her medication on a regular basis, or that the medication needs to be reviewed and perhaps adjusted.

6.      [Mother] was to seek employment and has not obtained employment of any kind . . . .  She was to obtain her GED.  She enrolled in a GED preparation course, but has not attended.  She is totally dependent on others to provide for her and to care for her.  The only significant step she has taken toward reunification with her son is to have obtained her own apartment.  That apartment is provided totally through subsidies . . . .

7.     . . . [Mother] does not seem to have the energy, motivation or drive to do what she needs to do to demonstrate she can adequately care for her son. . . . [W]hen she was more on her own, she began to miss visits, to be late for visits, to miss case management sessions or to be late for them.  On occasion, the case manager would arrive for an appointment and not be able to awaken [Mother] . . . .  The Court believes the difficulty with sleep is a symptom of severe depression, drug use or both.  In either event, [Mother] will not be in a position to care for [D.T.] until she clears her mind and body of drugs and then comes to terms with the issues that underlay [sic] her depression.  . . . [D.T.] requires permanency and the stability and security of a family life that will support and nurture him.  The Court finds that [Mother] cannot provide that to [D.T.] at this time.

(App. 17-18).

DECISION

Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility. *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997).  The purpose of termination of parental rights is not to punish parents but to protect children.  *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses.  *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010).  We consider only the evidence most favorable to the judgment.  *Id.*  Where the

trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.* "[P]rovided there exist at least some valid findings to support the trial court's conclusions, erroneous findings will not prove fatal." *A.F. v. Marion County Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

When DCS seeks to terminate parental rights, it must plead and prove in relevant part that:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> . . . .
>
> (C) that termination is in the best interests of the child[.]

Ind. Code § 31-35-2-4(b)(2). These allegations must be established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133.

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the two elements by clear and convincing evidence. *See Bester v. Lake County*

10

*Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005). Thus, if we hold that the evidence sufficiently shows that the conditions resulting in removal will not be remedied, we need not address whether the continuation of the parent-child relationship poses a threat to the well-being of D.T. *See* I.C. § 31-35-2-4(b)(2)(B); *A.N.J.*, 690 N.E.2d at 721 n.2.

1. Conditions Remedied

In this case, Mother asserts that DCS failed to establish that the conditions resulting in the removal of D.T. will not be remedied. To determine whether the conditions are likely to be remedied, the trial court must examine the parent's fitness to care for the child "as of the time of the termination hearing and take into account any evidence of changed conditions." *In re S.P.H.*, 806 N.E.2d 874, 881 (Ind. Ct. App. 2004). The trial court, however, also must determine whether there is a substantial probability of future neglect or deprivation. *Id.* In so doing, the trial court "may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *McBride v. Monroe County Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

The trial court may also consider the services offered to the parent and the parent's response to those services. *Id.* "Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." *Id.*

11

Thus, the trial court need not wait until a child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

Here, DCS removed D.T. from Mother's care after Mother admitted to, and tested positive for, drug use. Although Mother subsequently tested negative for drugs, she again tested positive for marijuana only one month prior to the termination hearing, and Mother admitted to fraternizing with someone who smoked marijuana.

Furthermore, the evidence shows that Mother failed to comply with court-ordered services, including following the recommendations for substance-abuse treatment; obtaining employment and her GED; fully participating in visitation; attending case management meetings; and obtaining help managing her medications.

We find that the evidence clearly and convincingly supports the findings, which clearly and convincingly support trial court's conclusion that the conditions that resulted in D.T.'s removal will not be remedied. We therefore cannot say the trial court's judgment is clearly erroneous.

2. Best Interest

Mother also challenges the trial court's finding and determination that termination of her parental rights is in the best interest of D.T. For the "best interest of the child" statutory element, the trial court is required to consider the totality of the evidence and determine whether the custody by the parent is wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App.

2010). In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id.* In addition, the recommendations of the caseworker and CASA that parental rights be terminated support a finding that termination is in the child's best interest. *C.T. v. Marion County Dep't of Child Serv.*, 896 N.E.2d 571, 586 (Ind. Ct. App. 2008), *trans. denied*.

Both DCS case manager Meadows and the CASA testified that it would be in D.T.'s best interest to terminate Mother's parental rights as D.T. needs stability and permanency. The trial court heard testimony that Mother's pattern of behavior indicates that she lacks the motivation to provide the stable environment necessary for D.T. to thrive. This is reflected in Mother not progressing to home visits with D.T. due to her unreliability.[2] The recommendations and testimony, along with the evidence of Mother's relapse and failure to complete services support the trial court's finding that termination of Mother's parental rights is in D.T.'s best interests.

Upon review, we find that DCS established its allegations against Mother by clear and convincing evidence. Such evidence supports the trial court's findings that the conditions that resulted in the removal of D.T. will not be remedied and that termination is in his best interests.

Affirmed.

NAJAM, J., and RILEY, J., concur.

---

[2] Mother maintains that her depression contributed to her behavior. The trial court, acknowledging Mother's depression, ordered her to participate in a medication evaluation. Mother does not refute, however, that she failed to do so.

13