**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 13 2012, 8:43 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**CRAIG JONES**
DCS, Tippecanoe County Office
Lafayette, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF B.M., And A.M., (Minor Children) and J.R., (Mother), | ) ) ) ) | |
| Appellant, | ) ) | |
| vs. | ) ) | No. 79A02-1112-JT-1189 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) ) | |
| Appellee. | ) ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta H. Rush, Judge
The Honorable Faith Graham, Magistrate
Cause No. 79D03-1107-JT-98 and 79D03-1107-JT-100

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

STATEMENT OF THE CASE

J.R. ("Mother") appeals the termination of her parental rights as to her minor children, B.M. and A.M. (collectively, the "Children").[1]

We affirm.

ISSUE

Whether there was clear and convincing evidence to support the termination of Mother's parental rights.

FACTS

B.M was born on October 29, 2004, and A.M. was born on January 6, 2006. On September 24, 2009, the Tippecanoe County's office for the Indiana Department of Child Services ("DCS") received a report that Father had kicked A.M. in the face the night before. When an intake officer with DCS investigated the report, she observed a bruise to A.M.'s left eye. Mother told the officer that Father's shoe had hit A.M. when he kicked his shoes off his feet. The officer advised Mother to take A.M. to the doctor to have her eye examined.

---

[1] The trial court also terminated the parental rights of T.M. ("Father"). He does not appeal the termination.

During her visit, the investigating officer found the family's apartment to be dirty. The Children also appeared to be developmentally delayed. Three-year old A.M. communicated by "growling" and had "minimal verbal skills . . . ." (Tr. 31). B.M., who was almost five years old, "could not speak very well." (Tr. 32).

Upon further investigation, the officer discovered that a prior report of medical neglect regarding B.M. had been substantiated. In that case, Mother had been referred to First Steps in December of 2005 because B.M. could not walk. First Steps, however, closed the family's file on November 10, 2006, due to Mother's failure to participate.

The investigating officer returned to the home on September 29, 2009. Although she found the home to be cleaner, A.M.'s eye appeared worse, and Mother admitted that she had not taken A.M. to the doctor. On October 5, 2009, the officer contacted the Riggs Health Clinic and was informed that Mother still had not taken A.M. to the doctor. By October 8, 2009, however, Mother had taken A.M. to the doctor.

On October 15, 2009, DCS filed a petition, alleging the Children to be children in need of services ("CHINS"). Mother admitted the allegations. The trial court found the Children to be CHINS and ordered that they remain in Mother's care. On December 29, 2009, the trial court entered a parental participation decree, wherein it ordered Mother to, among other things, "[o]btain and maintain employment"; participate in family preservation services; complete parenting classes; and follow all mental-health related recommendations. (DCS Ex. 1 at 25).

3

DCS filed a progress report on or about March 9, 2010, in which DCS reported that the Children had extensive dental problems and that neither child had been potty trained. DCS also reported that A.M. had not been immunized. At some point, Mother and Father had shaved the Children's heads due to an infestation of lice.

The trial court held a review hearing on March 16, 2010, after which it ordered that the Children attend preschool through Greater Lafayette Area Special Services and go to all medical and dental appointments. The trial court noted that "dental care, personal hygiene and toilet training are priorities for this family." (DCS Ex. 1 at 23). Both children began attending pre-school in April of 2010.

On June 14, 2010, DCS filed a progress report, wherein it reported that the Children had been to a dentist in May and that A.M. had received two vaccinations and had an appointment to receive her last set of immunizations. DCS also reported that A.M. had made progress with her potty training. As of the subsequent progress report, filed on October 7, 2010, however, neither child had been potty trained. The Children also had issues with hygiene.

The trial court held a permanency hearing on October 14, 2010, after which it continued the placement of the Children with Mother. The trial court, however, noted that "family preservation services are increasing instead of decreasing due to persistent instabilities within the family." (DCS Ex. 1 at 18). The trial court further found "that the objectives of the dispositional decree have not been accomplished" but "that there is still a probability of success in attaining said objectives . . . ." (DCS Ex. 1 at 18). The trial

4

court ordered Mother to ensure that Children "do NOT miss ANY medical appointments" and "follow all recommendations as to medical care for the [C]hildren." (DCS Ex. 1 at 18). The trial court entered a similar order on November 24, 2010, and set the matter for a review hearing.

In early December of 2010, DCS addressed possibly placing the Children with relatives. Mother, however, failed to identify any relatives with whom the Children could be placed.

Following a review and emergency modification hearing on December 22, 2010, the trial court found that the Children "should be removed from the home because continuation in the home would not be in the best interest of the [C]hildren and contrary to the welfare of the [C]hildren." (DCS Ex. 1 at 12). Specifically, the trial court found as follows:

> [T]estimony is submitted from which the Court determines the [C]hildren's needs are not being adequately addressed in the home despite a long period of extensive drop-in services provided by family preservation/case management. Although Mother has improved in some areas, the [C]hildren have minimally progressed in the past year and are still not fully potty-trained. Mother's reports of consistent routine in the home are not being observed. Court finds the Mother . . . [is] unable to parent the [C]hildren without constant support and oversight of service providers and others. [Mother] needs to focus on [her] own issues independently to increase stability and improve parenting skills. It is in the best interests of the [C]hildren to provide an alternative, structured environment that can meet their independent, special needs.

(DCS Ex. 1 at 13). The trial court therefore ordered that the Children be placed in foster care and that Mother participate in visitation, with the frequency, duration and

5

supervision to be determined by DCS. DCS continued providing services to Mother in order to facilitate reunification. The services included parenting classes and "during visitation she would be taught about discipline, how to keep the [C]hildren safe, [and] activities she could do with the [C]hildren." (Tr. 103-04).

In February of 2011, B.M.'s foster mother expressed concern because B.M. seemed to have trouble breathing while sleeping and suffered severe congestion. In March of 2011, doctors diagnosed B.M. with "severe sleep apnea syndrome" and hearing loss caused by prior untreated ear infections. (DCS Ex. 18). According to the diagnosis, B.M. suffered from "adenotosillar hypertrophy," which was "part of the reason he has his serous otitis media[2] and conductive hearing loss." (DCS Ex. 18). The doctor believed that B.M.'s condition resulted from "less than adequate health care in the past" and may have contributed to his speech and language delays. (DCS Ex. 18). B.M. subsequently underwent surgery to have his tonsils and adenoids removed. Although Mother participated in the doctor's visits, she could not relay pertinent information regarding B.M.'s past medical history and medications.

On July 26, 2011, DCS filed petitions to terminate Mother's parental rights. In September, DCS removed the Children from their foster home after issues unrelated to the Children arose there and placed them with another foster family.

---

2 "[I]nflammation of the middle ear marked especially by pain, fever, dizziness, and hearing loss[.]" http://www.merriam-webster.com/dictionary/otitis (last visited June 22, 2012).

The trial court held a final hearing on October 7, 2011. Paul Stam, a therapist with Families United, testified as follows. He began counseling Mother in late August of 2010 in order to help Mother "develop[] independence, or independence skills" through gainful employment, furthering her education and obtaining a driver's license. (Tr. 8). Stam counseled Mother for approximately one year. Although Mother eventually obtained employment, Stam believed that Mother did not gain "the ability to lead her children, to understand their developmental difficulties and compensate for that, [or] to provide for them . . . ." (Tr. 14). He opined that Mother could not safely provide for the Children's needs "on her own" but "would need some fairly extensive support from someone else helping her to care for the [C]hildren." (Tr. 15).

Claire Eberle, a home-based case manager with Families United, provided home-based services to Mother two to three times per week.[3] She testified that the lack of medical care for the Children was one of her main concerns. Specifically, she testified that Mother could not identify when the Children had medical problems or needs. According to Eberle, Mother "would always need prompting from a service provider or the teacher or someone else to identify this need before it would be addressed." (Tr. 28). She gave as an example Mother's failure to obtain treatment for B.M.'s chronic diaper rash and psoriasis. Eberle also noted that Mother had failed to potty train the Children

---

[3] During this time, Father stayed at the family home approximately fourteen days per month, but "there would be periods of time where [Father] would disappear for three weeks, four weeks . . . ." (Tr. 35). Finally, at the end of March of 2011, Mother indicated that she and Father no longer were in a relationship. Thus, DCS directed most of the services toward Mother.

and had difficulty identifying when the Children were not meeting milestones in their development and how to address those issues.

According to Eberle, she never saw the Children "fully clean" while they resided with Mother. (Tr. 57). She testified that the Children "usually had dirt caked under their nails and generally were dirty" despite Mother's claim that she bathed the Children every night. (Tr. 57).

Eberle testified that Mother's lack of honesty and candor affected Eberle's ability to work with Mother. For example, Mother lied about paying the utilities and only told the truth once the utility shut off her power. Mother also claimed to be attending classes for her general education degree, but "then eventually it came out at a meeting that she really hadn't been doing that for several weeks and had been lying about that." (Tr. 53). Mother also had difficulty making good decisions regarding her budget. Eberle testified that Mother would pay the cable bill instead of paying for necessities.

Eberle further testified that DCS finally removed the Children because their needs were not being "adequately addressed and met in the home despite the extensive services that had been provided to the family. The parents weren't able to parent the [C]hildren without the constant support of an oversight of service providers . . . ." (Tr. 56). Thus, DCS determined it to be in "best interests of" the Children "to put them in an alternative structured environment that could meet their needs." (Tr. 56).

Once DCS placed the Children outside of Mother's care, the Children's "health improved," "their medical needs were fully addressed," and their hygiene improved. (Tr.

56).  Furthermore, once the Children went into foster care, their cognitive skills improved dramatically.

According to Eberle, Mother completed parenting classes and consistently attended visitations with the Children.  During visits, Mother interacted appropriately with the Children; she, however, "seemed more as an older sister or a playmate" to the Children and did not effectively discipline them.  (Tr. 89).  Eberle noted that the Children had "phenomenal discipline problems at the beginning of the case," which did not improve until the Children were placed in foster care.  (Tr. 59).  The visitation facilitator, however, observed that the Children's behavior often degenerated during Mother's visits, and the facilitator had to "interject" several times because B.M. would harm himself, his sister or Mother.  (Tr. 89).

Eberle testified that once Mother and the Children moved to a new apartment in February of 2010, the apartment remained clean.  Mother also obtained employment in the spring of 2011.  By the final hearing, however, Mother had quit her job because her "boss kept on scheduling [her] on the days [she] was supposed to have . . . visits" with the Children.  (Tr. 186).  Mother later admitted that her employer did not have issues with her rescheduling due to visitations.  Rather, Mother just found it inconvenient.

Megan Horn, a case manager with DCS, began working with the family in November of 2010.  She testified that Mother had shown "very minimal progress" in meeting the Children's needs, while the Children "have progressed significantly outside"

9

of Mother's care. (Tr. 112). She testified that despite participating in services, Mother could not "internaliz[e] what she was learning" or put it "into action . . . ." (Tr. 105).

Horn further testified the she believed the parent-child relationship posed a threat to the Children's well-being, opining that the Children "would regress back to the behaviors and cognitive abilities they had before and also due to the medical issues" that would not be addressed. (Tr. 112-13). For instance, despite being told that B.M. had an enlarged heart and liver and therefore "needed to eat more nutritiously and also that his portions needed to be decreased so that he could lose more weight," Mother provided him with junk food and fast food during her visits. (Tr. 111).

Horn also testified that she believed termination of Mother's parental rights to be in the Children's best interests. According to Horn, the Children's foster parents had expressed a desire to adopt the Children and that the Children were "showing signs of bonding well with this family." (Tr. 133). She expressed concerns regarding placing the Children with their maternal grandmother, particularly whether the grandmother could financially afford it and whether the grandmother would place the Children back with Mother. DCS also "had concerns about caring for three special needs children all at once as well" since the grandmother already cares for the Children's half-brother, who had been diagnosed as autistic. (Tr. 126).

Sarah Guerrettaz, the court-appointed special advocate ("CASA"), testified that the Children's progress "seems to have blossomed since they've been in school and since the removal of them from the home to the foster home . . . ." (Tr. 141). She testified that

10

their speech and social skills had improved dramatically, and both were potty trained within weeks of their removal from Mother's home. She further testified that prior to his removal, B.M. "was considered [to have a] severe cognitive disability" but has since been identified as having only a "mild cognitive disability" while his sister had been identified as having the potential to obtain her high school diploma where she "was initially projected to get only an attendance of record for her school . . . ." (Tr. 143). She opined that termination of Mother's parental rights would be in the Children's best interests.

The Children's maternal grandmother C.B. testified that Mother's older son had been in her care since 2005 because she did not trust Father with him. C.B., however, had not obtained legal guardianship over the child until August of 2011. She testified that she would be willing to adopt the Children.

On November 14, 2011, the trial court entered its order, terminating Mother's parental rights.

## DECISION

Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility. *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997). The purpose of termination of parental rights is not to punish parents but to protect children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind.

11

2010). We consider only the evidence most favorable to the judgment. *Id.* Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.* "[P]rovided there exist at least some valid findings to support the trial court's conclusions, erroneous findings will not prove fatal." *A.F. v. Marion County Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

When DCS seeks to terminate parental rights, it must plead and prove in relevant part that:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> . . . .
>
> (C) that termination is in the best interests of the child[.]

Ind. Code § 31-35-2-4(b)(2). These allegations must be established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133.

12

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the two elements by clear and convincing evidence. *See Bester v. Lake County Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005). Thus, if we hold that the evidence sufficiently shows that the conditions resulting in removal will not be remedied, we need not address whether the continuation of the parent-child relationship poses a threat to the well-being of D.T. *See* I.C. § 31-35-2-4(b)(2)(B); *A.N.J.*, 690 N.E.2d at 721 n.2.

1. Conditions Remedied

In this case, Mother asserts that DCS failed to establish that the conditions resulting in the removal of the Children will not be remedied, where she "satisfactorily attended and completed every service available." Mother's Br. at 19.

To determine whether the conditions are likely to be remedied, the trial court must examine the parent's fitness to care for the child "as of the time of the termination hearing and take into account any evidence of changed conditions." *In re S.P.H.*, 806 N.E.2d 874, 881 (Ind. Ct. App. 2004). The trial court, however, also must determine whether there is a substantial probability of future neglect or deprivation. *Id.* In so doing, the trial court "may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *McBride v. Monroe County Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

13

The trial court may also consider the services offered to the parent and the parent's response to those services. *Id.* "Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." *Id.* Thus, the trial court need not wait until a child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

In this case, the issue is not whether Mother participated in services; rather, it is her response to those services. The record shows that after a year of intensive services, including parenting classes and home visits, Mother still failed to recognize and address the Children's physical and developmental needs. DCS presented evidence that, after one year, the Children still had not been potty trained and their hygiene continued to suffer. Although Mother did not resist seeking medical attention for the Children, she had to be prompted to do so by case managers and the Children's teachers. The evidence also shows that once the Children were removed from the home, they showed remarkable improvement in their hygiene, communication skills, education levels, and interaction with others; thus, the Children progressed quickly once in foster care. The trial court heard extensive testimony that although Mother had good intentions, she was not able to apply the skills taught in parenting classes to her life, and service providers expressed concern that the Children would regress if placed with Mother.

14

We find that the evidence clearly and convincingly supports the findings, which clearly and convincingly support the trial court's conclusion that the conditions that resulted in the Children's removal will not be remedied. We therefore cannot say the trial court's judgment is clearly erroneous.

2.  Best Interests and Satisfactory Plan

Mother also asserts that termination of her parental rights is not in the Children's best interests and that DCS has failed to show that there is a satisfactory plan for the placement of the Children because "[t]he DCS plan was for the [C]hildren to be adopted by people who had know them for a few weeks, rather than their own grandparents who had known them since birth, and with whom their brother resides." Mother's Br. at 23. She contends that the Children should be placed with their maternal grandmother.

For the "best interest of the child" statutory element, the trial court is required to consider the totality of the evidence. *In re B.J.*, 879 N.E.2d 7, 22 (Ind. Ct. App. 2008), *trans. denied*. "[I]n determining the best interests of the children, the trial court must subordinate the interests of the parents to those of the children." *Id.* In addition, the recommendations of the caseworker and CASA that parental rights be terminated support a finding that termination is in the child's best interest. *C.T. v. Marion County Dep't of Child Serv.*, 896 N.E.2d 571, 586 (Ind. Ct. App. 2008), *trans. denied*.

Before the trial court may terminate the parent-child relationship, however, it must find that there is a satisfactory plan for the care and treatment of the child. *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). "This plan need not be detailed, so long as it

15

offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Id.* Generally, adoption is a satisfactory plan. *See id.*

Both the family case manager and CASA testified that the Children are doing well in their foster home and have bonded with their foster family. They further testified that they believed termination of Mother's parental rights to be in the Children's best interests. The case manager also testified that DCS's plan for permanency is adoptive placement.

The trial court heard testimony that Mother's pattern of behavior indicates that she lacks the motivation and wherewithal to provide a healthy environment necessary for the Children to thrive. This is reflected in Mother not progressing in services. The recommendations and testimony, along with the evidence of Mother's failure to respond to services, support the trial court's finding that termination of Mother's parental rights is in the Children's best interests.

Finally, DCS presented evidence that the Children have bonded with, and are thriving in the care of, their foster family. DCS's permanency plan for the Children is adoption, and the Children's foster family has expressed interest in adopting them. Therefore, DCS has proven that there is a satisfactory plan in place.

As to placing the Children with their grandmother, both the case manager and CASA expressed concern about the grandmother's ability to parent three children with special needs. Because DCS has established a plan for the Children's adoption, Mother's contention that the trial court erred in failing to consider their placement with their

grandmother as an alternative to terminating Mother's parental rights also fails on this basis. *See In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009).

Based on the totality of the evidence, we find that there is sufficient evidence that the conditions that resulted in the Children's removal will not be remedied; termination of Mother's parental rights is in the best interests of the Children; and that DCS has a satisfactory plan. Accordingly, the elements necessary to sustain the termination of Mother's parental relationship with the Children were established by clear and convincing evidence.

Affirmed.

RILEY, J., and NAJAM, J., concur.