**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**DANIELLE L. FLORA**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**ALISA L. RUDE**
DCS Allen County Office
Fort Wayne, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

Apr 23 2013, 9:29 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF J.L.W. (Minor Child) and | ) ) ) ) |
| S.R.W. (Mother), J.C.H. (Alleged Father), and ALLEGED UNKNOWN FATHER, | ) ) ) |
| Appellants-Respondents, | ) ) |
| vs. | ) ) No. 02A03-1207-JT-307 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause No. 02D08-1103-JT-38

**April 23, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

S.R.W. ("Mother") appeals the trial court's involuntary termination of her parental rights to her child, J.L.W. We affirm.

## Facts and Procedural History

In its termination order, dated June 6, 2012, the trial court made the following findings and conclusions:[1]

2. J.L.W. was born to Mother on September 16, 2007.

3. Although identified as the child's father, Respondent [J.C.H.] has never established paternity for the child.

4. On November 3, 2008 a Preliminary Inquiry was held in the underlying Child in Need of Services case, 02[D]07-0810-JC-762. The Mother appeared but the alleged father did not. The Court found probable cause to believe that the child was in need of services. Thereafter an Additional Initial Hearing was held on December 9, 2008 and the case was referred for a Factfinding.

5. On April 13, 2009, the Mother admitted that she left the child in the care of [A.A.]. The Mother admitted that she watched as her boyfriend burned the child with a hot knife and whip her with a pipe like object.

6. After the child was injured by her boyfriend the mother did not provide the child with immediate medical attention. She then permitted him to have unsupervised contact with the child on the following day.

7. A Dispositional Decree was entered on April 13, 2009. [T]he child was placed in licensed foster care and a Parent Participation Plan was incorporated into the decree that required the Mother to:
   a. Refrain from all criminal activity;
   b. Maintain clean, safe, and appropriate housing at all times;

---

[1] The trial court's order sometimes refers to the parties by their full names. We use "Mother" and "J.L.W." where appropriate.

c. Notify the Department of [C]hild Services within forty-eight (48) hours of all changes in household composition, housing, and employment;

d. Cooperate with all caseworkers, the Guardian ad Litem and/or CASA, by attending all case conferences as directed; maintaining contact, and accepting announced and unannounced home visits;

e. Immediately provide the caseworkers with accurate information regarding paternity, finances, insurance, and family history;

f. Immediately provide the caseworkers and Mental Health Specialist with signed and current consents of release and exchange of information;

g. Provide the child with clean, appropriate clothing at all times and;

h. Fully cooperate with all rules of the child's placement.

i. Commence proceedings to establish paternity by meeting with the IV-D Prosecutor and fully cooperate with the IV-D staff to establish paternity.

j. Enroll in individual counseling or group counseling on domestic violence issues while incarcerated[,] attend all sessions, and successfully complete the counseling program.

k. Enroll in parenting classes while incarcerated, attend all sessions, and successfully complete the program.

l. Enroll in drug and alcohol counseling while incarcerated, attend all sessions, and successfully complete the counseling program.

m. Cooperate with your plea agreement.

n. Obey the terms of your incarceration.

o. While incarcerated enroll in education classes to secure G.E.D. and additional training for employment following incarceration.

8. On July 13, 2009 a Factfinding was held with regard to the alleged father, [J.C.H.]. The Court found that paternity had not been established in the child; that he had not provided for the child's material or financial support; that he had not maintained regular contact or visited with the child; and had abandoned the child. A Dispositional Decree was entered. The child was continued in licensed foster care and a Parent Participation Plan was issued by the court that imposed multiple obligations on the Alleged Father including a requirement that he establish paternity, enroll in parenting classes, pay support, participate in visits with the child, and maintain contact with the Department.

3

9. On September 21, 2009, this Court entered an order for a Permanency Plan that provided for the termination of parental rights. In adopting that Permanency Plan the Court specifically found that "the child, aged two years has been placed for almost one year. The child cannot be reunited with the mother for another three years. A relative out-of-state, Janice Jenkins, may be an appropriate care giver." (State['s] Exhibit 12).

10. Taking judicial notice of the records related to the Mother and child the Court finds that a petition to terminate parental rights was filed by [the] Department on February 9, 2010. It was subsequently dismissed on the Department's motion on February 18, 2010. On April 30, 2010 another petition to terminate parental rights was filed. A Factfinding was set for August 31, 2010. It, too, was dismissed on the Department's motion on February 7, 2011. A Factfinding was originally scheduled on the present petition for May 17, 2011. That date was continued on the Department's motion to August 30, 2011. On August 30, 2011 the Court ordered the Factfinding reset to October 25, 2011 because no transport order was requested for the Mother's appearance from prison. On October 25, 2011, mediation was ordered to consider a relative adoption. However, mediation was never completed.

11. The Mother was convicted for [sic] neglect of a dependent and was sentenced to Rockville Correctional [F]acility. Her release date is scheduled for June 12, 2012.

12. Upon her release the terms of her parole will allow her to have supervised contact with the child.

13. While in prison the Mother completed the requirements for a high school diploma, an eight (8) week domestic violence class, and an eight (8) week anger management class. She is participating in AA and a related program entitled "Celebrate [R]ecovery". Due to the nature of her crime she has not been eligible to enroll in parenting classes while in prison.

14. However, during her testimony at the Factfinding, the Mother was unable to articulate what she learned from her classes.

15. Following her release, the Mother can be referred for parenting classes upon release. Completion of that requirement will take an estimated three (3) to six (6) months.

4

16. The Mother last saw her child in October 2008. By terms of her sentence she has not been permitted any contact with the child while in prison.

17. The Mother now acknowledges her crime and admits that she acted to protect her boyfriend rather than her child.

18. The Alleged Father has wholly failed to comply with services. He has not established paternity. He has not had any contact with the child or the Department.

19. From the testimony of the Department's case worker Rachel Hudgins, the Court finds that attempts to locate the Alleged Father included letters to his last known address, an interview with his former girlfriend, a records check with various public / government record data bases, and an inquiry to the putative [father] registry.

20. The Department has investigated four (4) separate relatives in an attempt to place the child with the extended family. In each instance the relative was either excluded from consideration owing to a criminal history or requested that they not be considered for placement.

21. The child is in a pre-adoptive home. The child is very bonded with that family. The Department has an appropriate plan for the child should parental rights be terminated, that being adoption.

22. The child has been removed from the care of a parent under a dispositional decree for thirty-nine (39) months.

23. The child's Guardian ad Litem does not support a termination of parental rights. The Guardian ad Litem cites that there is no pattern of abuse by the mother, the mother has admitted her crime while in prison, and has done all she can to comply with the terms of the Dispositional Decree.

**FROM THE FOREGOING FINDINGS THE COURT CONCLUDES THAT:**

1. For parental rights to be *involuntarily* terminated the state must prove by [] clear and convincing evidence that the child has been removed from the parent for at least six (6) months under a dispositional decree; the court has entered a finding under IC 31-34-21-5.6 that reasonable

5

efforts for family preservation or reunification are not required; or that the child has been removed from the parent and placed under the supervision of the Department of Child Services for at least fifteen (15) months of the most recent twenty-two (22) months [IC 31-35-2-4 (b) (2) (A) and IC 31-35-2-8] [for burden of proof, see IC 31-37-14-2]. In the present case the child has been placed outside the care of [her] parents under a Dispositional Decree for more than six (6) months prior to the filing of the petition to terminate parental rights.

2.  In addition to the foregoing, the court must find that there is [a] reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or that continuation of the parent-child relationship poses a threat to the well being of the child [IC 31-35-2-4 (b) (2) (B) (i and ii) and IC[]31-35-2-8]. []A juvenile court "must assess the parent's ability to care for the children as of the date of the termination hearing." [*C.T. v. Marion County Department of Child Services*, 896 N.E.2d 571 (Ind. Ct. App. 2008) citing *Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d 615, 621 (Ind. Ct. App. 2006), trans. denied]. In this case, the child cannot be returned to the Mother's care immediately following her release from prison. At best, she will be able to have supervised contact with the child. Although the Mother has completed a multiple [sic] of programs while in prison, there is no present way to determine whether she has benefitted from those services. At the Factfinding she was not able to articulate what she has learned from the classes that she completed while in prison. The egregious nature of her crime against the child requires that diligence be exercised in the observation and supervision of the Mother's contact. Thus the Court cannot conclude that the reasons for placement of the child outside the home are now remedied or that they will be in the near future. A parent's incarceration standing alone should not serve as a basis for termination of parental rights. When a parent's release is imminent, the Court may conclude that a prayer for the termination of parental rights should not be sustained. See by way of example *Pappas v. A.S.*[,] 908 N.E.2d 191 (Ind. 2009); *In re* [*G*]*.Y*[*.*,] 904 [N.E.2d] 1257 (Ind.[]2009); and *Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d 615, 621 (Ind. Ct. App. 2006), trans. denied. However, this present case is disguisable [sic] from that line of cases. In each, the parent had a relationship with the child prior to imprisonment. In each, there was a level of contact by the parent with the child during the parent's incarceration, and in each, the parent was able to receive [the] child into

6

his or her care upon release from prison. In this case, the child was of very tender years when the Mother was jailed. By term[s] of her conviction she has not been permitted contact with the child and has not seen the child since October 2008. Upon her release, the Mother will only be able to have supervised contact with the child and therefore any date of reunification is unknown. The child is significantly bonded with the prospective adoptive parent. While the Guardian ad Litem opposes termination of parental rights, he did not recommend that the child be returned to the Mother's care upon her release. The Alleged Father has had no contact with the child and has not provided for the child's care or support during the pendency of the underlying CHINS case.

Based on the foregoing the Court concludes for [sic] the clear and convincing evidence that there is a reasonable probability that reasons that brought about the child's placement outside the home will not be remedied. The Respondent Mother has had services provided to her on multiple occasions stemming back to 2009. She has not yet successfully completed parenting instruction and despite the aid from several different SCAN Restoration Workers, the Mother did not demonstrate to any of them an ability to benefit from instruction. None of the visitation supervisors have recommended that the Mother is ready to care for her children independently.

3.      Termination must be in the child's best interests and the Petitioner must have a satisfactory plan for the care and treatment of the child. [IC 31-35-2-4 (b) [(2)] (C) and (D) and IC 31-35-2-8]. "Permanency is a central consideration in determining the best interests of a child." *In re* [*G*].*Y*.[,] 904 N.E.2d 1257, 1266 (Ind. 2009)[1]. [[1] The Indiana Supreme Court recognized the importance of permanency in a child's life but in the cited case determined that permanency could be accomplished without termination of parental rights. For the reasons stated in the above conclusions, the facts of this case from that of *In re* [*G*].*Y*.; necessitating, therefore a different conclusion.] Although the Guardian ad Litem has not concluded that termination is appropriate, this Court concludes that the child's best interests are served by terminating parental rights. The child has not seen the mother since October,[]2008. The child is bonded with the pre-adoptive parents with whom she has resided for a significant period of time. At minimum many more months will be required for the Mother to complete parenting classes and for the court to determine whether, outside of the controlled prison environment, she is able to demonstrate that she has benefitted from services. The Alleged Father has had no contact with

the child. The Father has consented to the termination of his parental rights. The child has been placed outside the parent's care for a substantial period of time. Through the termination of parental rights, the child can be adopted and permanency can be secured. Accordingly, the Court concludes that the child's best interests are served by granting the petition to terminate the parent-child relationship. The adoption of the [child] is an appropriate plan.

4.      The Department of Child Services has thus proven by clear and convincing evidence that the allegations of the petition are true and that the parent-child relationships should be terminated.

**THEREFORE, THE COURT NOW ORDERS, ADJUDGES, AND DECREES** that:

1.      The petition to terminate the parent[-]child relationships is hereby granted.

2.      The parent-child relationships between J.L.W., a minor child, born September 16, 2007 and the Respondents, Mother, [J.C.H.] and any UNKNOWN FATHER are hereby terminated and severed. All rights, privileges[,] immunities, duties, and obligations, including the right to consent to adoption, pertaining to that relationship are permanently terminated. The child is made a ward of the Department of Child Services for all purposes including adoption.

Appellant's App. at 12-17. Mother now appeals.[2]

**Discussion and Decision**

"The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). "Individuals who

---

[2]   J.C.H. and the alleged father do not appeal the termination of their parental rights. Pursuant to Indiana Appellate Rule 17(A), however, a party of record in the trial court shall be a party on appeal.

8

pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Matter of A.C.B.*, 598 N.E.2d 570, 572 (Ind. Ct. App. 1992).

Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:[3]

(2) The petition must allege:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

---

[3] Indiana Code Section 31-35-2-4 was amended slightly in 2012. We quote the version of the statute in effect when DCS filed its termination petition in 2011.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

Mother's sole argument is that the trial court erred in concluding that there is a reasonable probability that the conditions that resulted in J.L.W.'s placement outside the home will not be remedied. This Court has said,

When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services. Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination.

*In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012) (citations and quotation marks omitted).

More specifically, Mother asserts,

The DCS failed to put forth any evidence that [Mother] had not benefited from services. [Mother] admitted responsibility and regretted her decision to leave [J.L.W.] with her boyfriend. Mother additionally stated that she had learned from services about protecting her daughter. [Mother] had initiated services during her incarceration, and had completed services not required by the Parent Participation Plan. [Mother] attempted to find a suitable relative with whom [J.L.W.] could be placed. The Court should not disregard a parent's voluntary efforts while in prison. *H.G. v. Indiana Department of Child Services*, 959 N.E.2d 272, 291 (Ind.App. 2011) [, *trans. denied* (2012)]. The Guardian Ad Litem believed that [Mother] would not fail to protect her child again.

Appellant's Br. at 9-10 (citations to transcript and appendix omitted).[4]

J.L.W. was removed from Mother's care at a very young age after she was burned and beaten by Mother's boyfriend in Mother's presence. Mother failed to seek immediate medical attention for J.L.W. and let her have unsupervised contact with her boyfriend the next day. Mother was prosecuted for and convicted of neglect, was incarcerated for most of J.L.W.'s life, and was prohibited from having contact with her daughter. Mother completed many classes while in prison, but the trial court found that she was "not able to articulate what she has learned from" them. Appellant's App. at 4. This finding is supported by the evidence. For example, when asked what she had learned "from those services regarding taking care of [her] daughter," Mother replied, "Pretty much just protecting, like, I mean." Tr. at 34. The trial court was entitled to weigh and credit the testimony of Mother and the guardian ad litem as it saw fit, and we may not revisit those determinations on appeal.

---

[4] Mother also asserts, "The trial court's order referenced services provided to [Mother] on previous occasions. These statements are wholly unsupported by the record." Appellant's Br. at 10. Mother does not specify the objectionable portion of the order, but we presume that she refers to the last two sentences of Conclusion 2:

> The Respondent Mother has had services provided to her on multiple occasions stemming back to 2009. She has not yet successfully completed parenting instruction *and despite the aid from several different SCAN Restoration Workers, the Mother did not demonstrate to any of them an ability to benefit from instruction. None of the visitation supervisors have recommended that the Mother is ready to care for her children independently.*

Appellant's App. at 5 (emphasis added). Contrary to her assertion, Mother "has had services provided to her on multiple occasions stemming back to 2009" in the form of classes offered to her in prison. That said, DCS concedes that the italicized portion of Conclusion 2 is not supported by the record. Appellee's Br. at 13. We note, however, that "even an erroneous finding is not fatal to a trial court's judgment if the remaining valid findings and conclusions support the judgment, rendering the erroneous finding superfluous and harmless as a matter of law." *Curley v. Lake Cnty. Bd. of Elections & Registration*, 896 N.E.2d 24, 32 (Ind. Ct. App. 2008), *trans. denied* (2009). Such is the case here.

12

Moreover, at the time of the termination hearing in March 2012, J.L.W. had been removed from Mother for over three years. Upon her release from prison, Mother would be able to have only supervised contact with J.L.W., who the trial court found was "very bonded" with her pre-adoptive foster family. Appellant's App. at 5. Mother does not challenge that finding, nor does she challenge the finding that "[a]t minimum many more months will be required for [her] to complete parenting classes and for the court to determine whether, outside of the controlled prison environment, she is able to demonstrate that she has benefitted from services." *Id*. As we said in another case involving an incarcerated parent, "[e]ven assuming that [Mother] will eventually develop into a suitable parent, we must ask how much longer [J.L.W.] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*; *see also G.Y.*, 904 N.E.2d at 1265 ("Permanency is a central consideration in determining the best interests of a child.").[5] In sum, we cannot say that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in J.L.W.'s placement outside the home will not be remedied. Therefore, we affirm.

---

[5] Mother argues that "[s]hort term incarceration should not be the only reason for a court to terminate parental rights." Appellant's Br. at 10. As support for this proposition, Mother cites *G.Y.*, in which our supreme court reversed the trial court's order terminating an incarcerated mother's parental rights. We find Mother's argument unpersuasive. We first note that Mother's incarceration was not the only reason for the trial court's termination of her parental rights. We also note that the mother in *G.Y.* had been her child's "sole caretaker during the first 20 months of his life," was incarcerated for reasons unrelated to her parenting, and visited monthly with the child while in prison. 904 N.E.2d at 1258. Here, J.L.W. was slightly over a year old when Mother committed the act of neglect that resulted in her imprisonment, and Mother had no contact with J.L.W. during her three-plus years of incarceration due to the nature of her crime.

Affirmed.

ROBB, C.J., and FRIEDLANDER, J., concur.