# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 12 2016, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Marion County Public Defender Agency
Indianapolis, Indiana

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of S.C., Minor Child, and S.J., Father,

S.J.,

*Appellant-Respondent*,

v.

Indiana Department of Child Services,

*Appellee-Petitioner*,

and

October 12, 2016

Court of Appeals Case No.
49A02-1602-JT-367

Appeal from the
Marion Superior Court

The Honorable
Marilyn A. Moores, Judge
The Honorable
Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1503-JT-73

Child Advocates, Inc.,

*Co-Appellee-Guardian ad Litem*.

**Kirsch, Judge.**

[1] S.J. ("Father") appeals the juvenile court's order terminating his parental rights to his son S.C. ("Child"), raising the following restated issue: whether the evidence was sufficient to support the trial court's termination order.

[2] We affirm.

## Facts and Procedural History

[3] Father and T.C. ("Mother")[1] (together, "Parents") are the biological parents of Child, who was born in October 2013. Indiana Department of Child Services ("DCS") became involved with Parents in May 2014, when Mother was arrested and incarcerated. At the time of Child's removal, Father was in the Marion County Jail awaiting trial on the charge of possession of methamphetamine. Father was ultimately convicted and moved to the Indiana Department of Correction ("the DOC") in October 2014, where he remained until his release on September 10, 2015.

---

[1] Mother signed an "adoption consent" in this matter, thereby terminating her parental rights to Child. *Tr.* at 24. Consequently, Mother does not participate in this appeal.

[4] On May 23, 2014, DCS filed a petition alleging that Child was a Child in Need of Services ("CHINS"). That same day, the juvenile court in the CHINS action ("CHINS court") held an initial/detention hearing and authorized that Child be placed in relative care. Child was initially placed with his maternal grandmother, but soon thereafter was moved to the home of his maternal cousin, with whom he remained throughout the CHINS proceedings. On August 21, 2014, the CHINS court entered a dispositional order finding Child to be a CHINS; however, at that time no services were ordered for Father who was incarcerated. *Pet'r's Ex*. D at 4. Instead, the CHINS court ordered Father "to establish paternity and to contact the DCS [family case manager] within seventy-two (72) hours of his release from incarceration." *Id.* In February 2015, while Father was still incarcerated, the CHINS court held a permanency hearing and, over Father's objection, changed Child's permanency plan from reunification to adoption; this change was reflected in the CHINS court's February 26, 2015 Order.[2] *Pet'r's Ex*. E at 2. On March 2, 2015, DCS filed with the juvenile court a petition for the termination of parental rights ("TPR") of Parents. *Appellant's App*. at 20-23. During the ensuing ten months, proceedings in both the CHINS and the TPR actions continued in their respective courts.

---

[2] We note that the February 26, 2015 Order contained inconsistent statements regarding the plan for Child. One section of that Order provided: "The permanency plan for [Child] at this time is reunification with parent(s)." *Pet'r's Ex.* E at 2. Nonetheless, adoption was indicated as the permanency plan in at least two sections of the Order—"Court finds that it is in the [C]hild's best interest that the permanency plan be changed to adoption and ORDERS the same," and "[a] projected date for the children's adoption placement is 5/28/15." *Id*. at 2, 3.

The chronological facts that follow reveal the interweaving of the CHINS and TPR actions.

On March 13 and 27, 2015, the juvenile court appointed counsel for Father, appointed a guardian ad litem ("GAL") for Child, and held initial hearings on the TPR petition. *Id*. at 29, 31, 34-35. In the May 28, 2015 CHINS review hearing, Father agreed that his parents could adopt Child. *Pet'r's Ex*. F at 2. The next day, however, the parties reported to the juvenile court that paternal grandparents and maternal cousin were working in the CHINS action "towards a joint venture in caring for the [C]hild," and the juvenile court ordered the matter to mediation. *Appellant's App*. at 47. About a month and a half later, the juvenile court learned that mediation was unsuccessful.[3] *Id*. at 48-49.

By letter dated July 30, 2015, DCS informed Father that a TPR evidentiary hearing was scheduled for September 16, 2015. *Id*. at 54. At an August 21, 2015 pre-trial conference, the juvenile court, citing Father's impending release from the DOC, vacated the September 2015 TPR hearing, without objection from DCS, and scheduled a pre-trial conference for November 20, 2015. *Id*. at 55-56. The CHINS court held a review hearing on August 27, 2015 and, noting that Father's TPR hearing had been vacated, rescheduled a second CHINS

---

[3] While the mediation did not resolve the issue of Child's placement, it did result in Mother signing consents to Child's adoption. Accordingly, Mother was dismissed from the TPR proceedings without prejudice.

dispositional hearing for September 24, 2015. *Pet'r's Ex*. G at 2. The CHINS court also scheduled a placement review hearing for November 19, 2015.[4] *Id.*

[7] Father was released from the DOC around September 10, 2015, and he appeared at the CHINS dispositional hearing two weeks later. *Tr.* at 63-64. In anticipation of the hearing, DCS Family Case Manager Talia Anderson ("FCM Anderson") referred Father to various service providers. At the September 24, 2015 CHINS dispositional hearing, the CHINS court entered a Participation Decree, ordering Father to engage in a home-based case management program; complete and comply with a parenting assessment; complete and comply with a substance abuse assessment; submit to random drug screens; and successfully complete a Father Engagement Program. *Pet'r's Exs*. H & I.

[8] In a December 11, 2015 TPR pre-trial conference,[5] Father's counsel reported to the juvenile court that Father's parenting time had been suspended in the CHINS action because Father had "an alleged positive drug screen." *Tr.* at 58. During the December conference, the juvenile court set the TPR evidentiary hearing for January 27, 2016. *Id*. at 59. Just one day prior to the scheduled hearing, Father filed emergency motion to continue the TPR fact-finding hearing, claiming that four months—the amount of time between his September

---

[4] It is not clear whether a CHINS placement hearing was held on November 19, 2015. In fact, because the last CHINS document in the record before us is dated September 24, 2015, there is no evidence that any proceedings took place in connection with the CHINS action after September 24, 2015.

[5] The November 20, 2015 TPR pre-trial conference was delayed until December on the juvenile court's own motion. *Appellant's App*. at 57.

2015 release from the DOC and his January 2016 TPR fact-finding hearing—was insufficient time during which to complete services. The juvenile court denied Father's motion.

[9] The TPR evidentiary hearing was held on January 27, 2016. At the start of the hearing, Father renewed his motion for a continuance. DCS and the GAL objected to a continuance, and the juvenile court denied the motion. *Id*. at 67. FCM Anderson testified that Father sent her a letter from prison informing her that he had engaged in substance abuse treatment at the DOC. *Id*. at 26. She also testified that Father contacted her within seventy-two hours of his September 10 release from the DOC as required. *Id*. at 47. Upon meeting Father, FCM Anderson told him he needed to provide documentation verifying that he had participated in substance abuse treatment; Father never provided any documentation. *Id*. at 26-27.

[10] It was FCM Anderson's testimony that she referred Father to services in September 2015. *Id*. at 26. She said that she conveyed to Father that he would need to complete the services to have Child returned to his care. Father indicated he would be willing to complete whatever services were recommended. *Id*. at 28. Based on her communication with service providers, FCM Anderson had concerns about Father's participation in services and described Father's participation as "minimal." *Id.* at 17-18.

[11] Throughout the twenty months that the CHINS and TPR actions were pending, Child lived with his maternal cousin. FCM Anderson explained that Child's

placement was pre-adoptive and said, "[Child]'s doing very well." *Id*. at 20. DCS's permanency plan for Child was adoption by his maternal cousin, with whom Child "ha[d] built a bond." *Id*. at 30. FCM Anderson opined that there was a reasonable probability that Father would be unable to remedy the conditions that led to Child being removed from the home. Father was incarcerated for most of the case, and even after he was released and provided with services "he became incarcerated again." *Id*. at 21-22. Additionally, Father did not complete ordered services or address his substance abuse issues. *Id*. at 22. FCM Anderson testified that it would be in Child's best interest for Father's parental rights to be terminated. *Id*. at 23.

[12] DCS Family Case Manager Brittany Harpe ("FCM Harpe") worked on Child's case while FCM Anderson was on leave, a period of time from mid-September to mid-November 2015. FCM Harpe testified that she did not attend any of the CHINS proceedings; however, she visited Child monthly and contacted relative placement and Father. *Id*. at 54. Further, she referred services for Father from mid-October through mid-November 2015. Specifically, FCM Harpe ordered Father to participate in home-based case management and substance abuse assessment. *Id*. at 55. She also testified that she communicated with Father's service providers regarding his progress and, in turn, received updates. *Id*. FCM Harpe testified that she had concerns about Father's participation in the programs. *Id*. at 56. Additionally, no progress towards Child's reunification with Father was made while FCM Harpe was assigned to Child's case. *Id*. at 57.

[13] Guardian ad Litem Earlon Hollowell ("GAL Hollowell") testified that he works closely with DCS, getting reports and updates on how a child is doing. In this case, he had visited Child at the home of Child's maternal cousin and found that Child was doing well, developing at age-appropriate levels, and having his needs met. *Id*. at 95. GAL Hollowell testified that the maternal cousin was making sure that Child went to the doctor. The maternal cousin also took Child to various programs "to get him involved around other kids" and to make sure that he "ha[s] a normal child upbringing." *Id*. at 95-96. GAL Hollowell explained that one of his duties is to recommend a permanency plan that allows a child to have a "long term" home, with "no disruption" and "stability." *Id*. at 96. GAL Hollowell believed that adoption was in Child's best interest. As such, he recommended that Child be adopted by his maternal cousin. *Id*. at 98.

[14] Father testified that he was incarcerated on May 23, 2014, when Child was removed from Mother's care and the CHINS petition was filed. Father was released from the DOC on September 10, 2015 and began visits with Child in October 2015. At that time, Child was two years old and did not know Father, who had last seen Child in March 2014 when Child was five months old. *Id*. at 89, 90. In late October 2015, a little more than one month after Father was released from the DOC, Father again used methamphetamine and violated his parole. Due to this parole violation, Father was ordered to serve thirty days in the Marion County Jail, a sentence that ran from mid-December 2015 through

January 16, 2016. *Id*. at 66. Father had visited Child only four times before his visitation with Child was suspended. *Id*. at 72, 90.

[15] At the time of the January 2016 TPR fact-finding hearing, Father was unemployed and lived with his parents in Lafayette, Indiana. Father remained on parole and testified that he believed his parole would end around September 2017. Father admitted that if he has another parole violation, "his max out date is March of 2018." *Id*. at 64, 86-87. Father was asked why he again used methamphetamine. He responded, "[I] got overwhelmed, a lot of pressure. I've been in and out of prison for the last ten years, I mean, I mean, I've been in and out. I've been to prison five times and since . . . I have a hard time you know what I mean just coping." *Id*. at 65. When asked what he did to cope in October 2015, Father said, "I used [methamphetamine]." *Id*. at 65-66.

[16] Father testified that, while incarcerated in the DOC, he lived in a "therapeutic community" and participated in Narcotics Anonymous ("NA"), Alcoholics Anonymous, a parenting class, and a "living free" class. *Id.* at 66. As part of the "community," Father took part in therapeutic programs all day, every day. Father admitted that he did not provide FCM Anderson with any documentation of the services he completed in the DOC. *Id*. at 66-67, 74. Father also "remember[ed] being ordered to do a parenting assessment . . . or parenting education," but admitted he "didn't complete it." *Id*. at 70. Father insisted that he completed a substance abuse assessment before his relapse, but could not remember the name of the provider. *Id*. at 70-71.

[17] Father maintained that he sent a letter informing DCS that the DOC would release information regarding any programs in which Father had participated. *Id*. at 67. However, Father was uncertain whether the recipient of that letter was, in fact, DCS. *Id*. at 67-68. FCM Anderson testified that DCS received no verification that Father participated in and successfully completed services in the DOC. *Id*. at 26. During the TPR evidentiary hearing, Father maintained that his substance abuse issues had "been addressed." *Id*. at 87. Yet, he also testified about his drug use, saying, "I think I need to be involved in a . . . NA, substance class . . . because my addiction[,] it gets strong." *Id*. at 88.

[18] After taking the matter under advisement, the juvenile court issued its order on February 1, 2016, terminating Father's parental rights to Child. The juvenile court made specific findings and concluded:

> 26. There is a reasonable probability that the conditions that resulted in [Child]'s removal and continued placement outside the home will not be remedied by his alleged father. [Father] was given time to engage in services but has failed to remain engaged and has not made an effort to contact anyone regarding services. At the time of trial, he was unemployed, did not have independent housing, and still had substance abuse issues. Further, [Father] was incarcerated and unavailable to parent. He has a pattern of criminal activity which results in being incarcerated. He engaged in activity a month after his release that resulted in a parole violation. Given this pattern of behavior, there is a reasonable probability that he will be unavailable to parent in the future.
>
> 27. Continuation of the parent-child relationship poses a threat to [Child]'s well-being. [Child] has been a ward for twenty months.

Termination of parental rights would free [Child] to achieve permanency by being adopted into the only home and by the only parental figure he knows.

28. Termination of the parent-child relationship is in the best interests of [Child]. Termination would allow him to be adopted into a stable and permanent home where his needs will be safely met.

29. There exists a satisfactory plan for future care and treatment of [Child], that being adoption.

30. Based on [Child]'s placement and how services have worked, the Guardian Ad Litem believes it to be in [Child]'s best interests to be adopted by his current caregivers.

*Appellant's App.* at 17-18. Father now appeals.

# Discussion and Decision

[19] As our Supreme Court has recently reiterated, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App.

2001), *trans. denied.* That is, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied.*

[20] "When seeking to terminate parental rights, DCS must prove its case by 'clear and convincing evidence,' Ind. Code § 31-37-14-2 (2008)—a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d at 642 (quoting *In re G.Y.*, 904 N.E.2d 1257, 1260 n.1 (Ind. 2009)). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (citation omitted). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[21] Before an involuntary termination of parental rights may occur, the State is required to allege and prove:

> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B).[6]

[22] Father argues that DCS failed to prove the required elements for termination by clear and convincing evidence. Specifically, he contends that DCS failed to present sufficient evidence that the conditions that resulted in Child being removed or the reasons for his placement outside the home would not be remedied and that the continuation of the parent-child relationship poses a

---

[6] To terminate Father's parental rights, the State must also allege and prove that Child has been removed from Parents for "at least six (6) months under a dispositional decree." Ind. Code § 31-35-2-4(b)(2)(A). Father does not challenge the juvenile court's finding of fact on that element.

threat to Child's well-being. He also contends that DCS failed to prove that termination was in Child's best interest.[7] We address these issues in turn.

### *Remediation of Conditions*

[23] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's removal and placement outside the home, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step of the analysis requires judgment of the parent's fitness at the time of the termination hearing, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support,

---

[7] Father also contends that DCS failed to prove there was a satisfactory permanency plan in place for Child. However, he does not support that contention with meaningful argument or citations to authority. Therefore, he has waived any challenge to that element of the termination statute. *Slater v. Marion Cnty. Dep't of Child Servs.*, 865 N.E.2d 1043, 1047 (Ind. Ct. App. 2007) (citing Ind. Appellate Rule 46(A)(8)). Waiver notwithstanding, DCS's plan that Child would be adopted by his maternal cousin, with whom he had been living throughout the CHINS and TPR actions, was a satisfactory plan. *See In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (DCS plan is satisfactory if it attempts to find suitable parents to adopt children), *trans. denied*.

and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *Id.*

[24] Here, Father argues that Child's removal from and continued placement outside the home was prompted by his incarceration, and that that condition was remedied because he "no longer was incarcerated at the time of the termination hearing and was in recovery from the addiction which prompted his incarceration." *Appellant's Br.* at 23. Father maintains that he was first ordered to engage in services on September 24, 2015 and contends that four months—the period from late September 2015 to the termination of his rights in late January 2016—was insufficient time to complete his services. Father asserts that the conditions prompting Child's removal were also remedied by the time of the termination hearing because he had recently been involved in the DOC's therapeutic community, where he was "undergoing intensive training and treatment to prepare him for a life without drugs or crime." *Id.* at

25. Finally, he argues that "his diligence in participating in services after his release further demonstrates he has abandoned his previous pattern of drug use and incarceration and is fit to parent [Child]." *Id.*

[25]   In its order terminating Father's parental rights, the juvenile court made twenty-five findings of fact. *Appellant's App.* at 16-17. However, in claiming that the evidence was insufficient to support the juvenile court's order terminating his parental rights, Father challenges only five of those findings, Findings Number 10, 11, 12, 13, and 22.[8] To the extent Father does not challenge the juvenile court's remaining findings of fact, those unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by trial court resulted in waiver of argument that findings were clearly erroneous), *trans. denied*; *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when father failed to challenge specific findings, court accepted them as true). Assuming without deciding that Father's five challenged findings are not supported by sufficient evidence, such error will not prove fatal if there exist at least some valid findings to support the trial court's conclusion to terminate Father's parental rights. *A.F.*, 762 N.E.2d at 1251. We will therefore limit our review to whether these twenty unchallenged findings (cited in parenthesis below) are sufficient to support the juvenile court's conclusion

---

[8] Those findings in pertinent part provided: (1) Father was referred to services in September 2015 and re-referred in October and November 2015; (2) Father only finished the service for substance abuse assessment; (3) Father was not proactive in contacting service providers, but waited for them to get in touch with him; (4) Father had not contacted a FCM since mid-November 2015; and (5) at the December 11, 2015 TPR pre-trial conference, the parties requested a trial setting. *Appellant's App.* at 16-17.

that the conditions that led to Child's removal from and continued placement outside Father's care would not be remedied.

[26] The incarceration of Parents prompted Child's removal from and placement outside the home (Nos. 3 and 4). Child was later found to be a CHINS (No. 5). Initially, no services were ordered for Father, who was incarcerated (No. 6). Father was released from the DOC in September 2015, and on September 24, 2015, a new parental participation order directed Father to: complete and follow a substance abuse assessment; participate in and comply with home-based services and parenting assessment; complete a Father Engagement Program, and submit to random drug screens (Nos. 8 and 9). Father was told by a DCS family case manager that he would have to "engage in services and move forward" to accomplish reunification with Child (No. 12). Father completed some programs while incarcerated, mostly for substance abuse (No. 14). He also lived in a therapeutic community for nine months (No. 14). Father violated his parole by using methamphetamine in October 2015 and was incarcerated for thirty days; he was released in mid-January 2016 (No. 15). Father had "not undergone drug treatment since his relapse although he admitted he needed help and it was hard for him to cope as a result of being in and out of prison five times in the past ten years" (No. 16). The earliest Father will be released from parole is September 2017, but if he violates parole for a second time, he could be incarcerated until March 2018 (No. 17). Father began his visitation with Child in October 2015, but prior to that, had last seen Child in March 2014 when Child was five months old (Nos. 18 and 20). After Father

tested positive for illegal drugs, Father's parenting time was suspended (No. 19). Father visited with Child four times prior to that suspension. (No. 18). At the time of the TPR evidentiary hearing, Father was unemployed and lived with his parents (No. 21).

[27] In the second step of the two-step analysis, the juvenile court judges Father's fitness at the time of the termination hearing, taking into consideration evidence of changed conditions and balancing his recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643. Here, Father was incarcerated for possession of methamphetamine when Child was five months old. By the time Child was seven months old, Mother was also incarcerated, and Child was removed from Mother's home. Father remained incarcerated until Child was almost two years old. Upon his release from the DOC, Father was ordered to complete certain services to ensure reunification with Child. Father completed some drug abuse programs while in the DOC and sought to reunite with Child; still, he used methamphetamine about a month and a half after his release from the DOC and five weeks after services were ordered.

[28] It is true that Father was not incarcerated at the time of the termination hearing; nevertheless, he had been released from incarceration, due to the parole violation, only two weeks prior to the TPR evidentiary hearing. Father admitted he needed help, yet had not undergone drug treatment since his relapse. Furthermore, Father stated that he had been in and out of prison five

times in the past ten years and that stress was the reason that he relapsed and used methamphetamine in order to cope. *Tr.* at 65-66.

[29] Indiana courts have recognized, "Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children."[9] *K.T.K.*, 989 N.E.2d at 1235-36; *C.T. v. Marion Cnty. Dep't of Child Servs.*, 896 N.E.2d 571, 585 (Ind. Ct. App. 2008), *trans. denied*. Furthermore, "[e]ven assuming that [father] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to [his] development and overall well-being." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006) (concluding that trial court did not commit clear error in finding conditions leading to child's removal from father would not be remedied where father, who had been incarcerated throughout CHINS and termination proceedings, was not expected to be released until after termination hearing), *trans. denied*.

[30] Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that

---

[9] Our Supreme Court has recognized that incarceration is an insufficient basis for terminating parental rights. *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 643 (Ind. 2015). That case, however, is distinguishable from the instant case. There, father had "made substantial efforts towards bettering his life through programs that were available during his incarceration." *Id*. at 648. Further, Father actively participated in substance abuse programs, and he established a bond with K.E. through regular visitation and nightly telephone calls. *Id*. at 649. Here, Father did not complete all of the services he was ordered to complete, and he was only able to complete four visits with Child before his visitation was suspended due to his use of methamphetamine.

resulted in Child's removal and continued placement outside the home will not be remedied.[10]

### *Best Interests of Child*

[31]   Father asserts that there was insufficient evidence to support the juvenile court's conclusion that termination of the parent-child relationship was in Child's best interests. In determining what is in the best interests of the child, the trial court must look beyond the factors identified by DCS to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* "Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *Id.* at 1158-59.

---

[10] Father contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Therefore, finding, as we do, that sufficient evidence supports the conclusion that the conditions resulting in the removal of Child would not be remedied, we need not also address whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Child.

[32] Here, DCS proved that there a reasonable probability that the circumstances leading to Child's removal from the home will not be remedied. Further, FCM Anderson and GAL Hollowell supported the termination of Father's parental rights and the adoption of Child by maternal cousin, claiming that such a permanency plan was in Child's best interest. Father claims that FCM Anderson's and GAL Hollowell's assessments of Child's best interests were "based in large part on their mistaken view that Father had not engaged in services." *Appellant's Br.* at 28. That claim, however, invites this court to reweigh the evidence or judge the credibility of the witnesses, which we will not do. *Bester*, 839 N.E.2d at 147. Child has been with his maternal cousin since he was an infant and that is the only home he has ever known. Father has been in and out of prison five times in the last ten years, and less than two months after he was released from the DOC, he relapsed and returned to using methamphetamine even though he had participated in substance abuse treatment. At the time of the termination hearing, Father was unemployed. Additionally, he had a minimal emotional bond with Child, having seen him only four times before his visitations were suspended due to his use of drugs. Here, the totality of the evidence supports the trial court's determination that termination of Father's parental rights is in Child's best interests. The trial court's "best interest" conclusion is not clearly erroneous.

[33] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based

on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[34] Affirmed.

May, J., and Crone, J., concur.